Andersen *v.* The State.

# SUPREME COURT OF ERRORS.

## COUNTY OF NEW HAVEN.

### APRIL TERM, 1876.

### Present,

### PARK, C. J., CARPENTER, FOSTER, PARDEE AND LOOMIS, JS.

---

## JOHN ANDERSEN *vs.* THE STATE.

The Superior Court has no power, upon a petition for a new trial, to grant a new trial for error in the charge of the court or on the ground that the verdict is against the evidence.

New trials are granted for these causes only by the Supreme Court, upon motions filed in the lower court, and at the same term at which the case was tried.

The Superior Court has the power, on petition, to grant new trials for newly-discovered evidence. A petition for that cause is addressed to the discretion of the court, and the decision of the court is not the subject of revision by this court.

There is no express authority for the granting of new trials by the Superior Court in criminal causes, but such power is implied in certain provisions of the statute, and has been repeatedly exercised.

There are certain well-established rules which govern the court upon such petitions and which are strictly applied in civil causes, but in a case where human life is at stake justice and humanity require the court to make a less rigid application of these rules.

One of these rules is, that a new trial shall not be granted for newly-discovered evidence, if the evidence might have been discovered and produced on the trial by the use of reasonable diligence.

What is reasonable diligence in a particular case is to be determined upon consideration of all the circumstances of the case.

Where the petitioner had been convicted of murder in the first degree, and sentenced to be hanged, and his sole defence had been insanity, and it appeared that he had been kept in close confinement from the time of the homicide to the time of the trial, that he was poor and a foreigner and perhaps really insane, and that his sole counsel was a young lawyer of little experience, it was held that his petition ought not to be denied on the ground of negligence.

Andersen *v.* The State.

Another of the rules governing such petitions is, that the newly-discovered evidence must not be merely cumulative.

Where the newly-discovered evidence was only additional evidence of the petitioner's insanity, consisting of the testimony of various persons who had on different occasions observed his conduct and regarded it as indicating insanity, it was held that, if the court could see that it might reasonably affect the result, the fact that the evidence was in some sense cumulative, ought not, in a case where life was at stake, to be decisive against the granting of a new trial.

Unsoundness of mind is a fact which is not susceptible of direct proof. In many cases it can be established only by a series of facts and by conduct extending over a considerable period. A large number of acts indicating insanity will generally produce a greater effect upon the mind of the trier than a small number. Thus merely cumulative evidence may be more important upon such an inquiry than in other cases.

And it is a consideration of importance in the present case, that, even if the proof should not establish the total want of responsibility by reason of insanity, yet it might show that the prisoner's mind was so impaired that he was incapable of a deliberate, premeditated murder, and so should be convicted only of murder in the second degree.

Under our statute, which divides murder into two degrees, there is ample opportunity to make some allowance for those cases where, from any cause, excitement and passion continue beyond the limits allowed by the common law, and impel to the commission of crimes which would not be committed in cooler moments.

And a person of excitable temperament and morbidly jealous and suspicious may be so wrought upon by exasperating causes, that, with time enough for passion to cool in an ordinary case, he may yet not have recovered a rational control of himself.

Courts have been slow to recognize moral insanity as an excuse for crime; but that it exists and is well understood and in some cases clearly defined by medical and scientific men, can not be denied.

And a jury, where satisfied of its existence in a particular case, ought to consider it in determining the degree of crime, and to give it such weight as it is fairly entitled to under the circumstances.

[PARK, C. J., and LOOMIS, J., dissenting with regard to the granting of a new trial for newly-discovered evidence.]

PETITION for a new trial, upon a conviction of murder in the first degree; brought to the Superior Court in New Haven County, and reserved, upon a finding of the facts, for the advice of this court. The case is sufficiently stated in the opinion.

*L. N. Blydenburgh* and *R. S. Pickett*, with whom was *J. Bishop*, for the petitioner.

*T. E. Doolittle* and *L. M. Hubbard,* for the State.

CARPENTER, J. The petitioner, having been convicted of murder in the first degree, brought his petition to the Superior Court praying for a new trial on three distinct grounds: 1st, for error in charging the jury by the court; 2d, for a verdict against the weight of evidence; and 3d, for newly-discovered evidence. The case is reserved for the advice of this court.

The application in respect to the first two grounds is a novel one. We have no precedent for such a proceeding in our reports.

The statute authorizes the Superior Court to grant new trials for mispleading, the discovery of new evidence, want of notice, &c., or other reasonable cause, according to the usual rules in such cases. This provision relates to civil actions. There is no express authority for the Superior Court to grant new trials in criminal causes. There is a statute limiting a time within which petitions for new trials in criminal cases shall be brought; and it is understood that the Superior Court has the power to grant such petitions, and such power has been repeatedly exercised.

Another statute prescribes the mode in which the Supreme Court of Errors may grant new trials in civil and criminal causes for errors in charging the jury, or in receiving or rejecting testimony; and also for a verdict against evidence. These are granted only upon motions filed in the lower court, and at the same term at which the case was tried. Gen. Statutes, tit. 19, ch. 15, secs. 3, 5.

We have no statute and no practice authorizing the Superior Court to grant new trials for either of the causes above named. The expression, "or other reasonable cause," has never been understood as including causes which, by another statute, are within the jurisdiction of the Supreme Court. That jurisdiction has hitherto been regarded, and we must continue to regard it, as exclusive. The evils which would result from a contrary interpretation are too obvious to require argument.

The Superior Court has the power to grant new trials for the discovery of new evidence, as we have seen. A petition

for that cause is addressed to the discretion of the court; and when a decision is once made it is not the subject of revision by this court. *Parsons* v. *Platt*, 37 Conn., 563, and cases there cited.

These cases however have been reserved for the advice of this court, and the advice asked for has been given. *Lester* v. *The State*, 11 Conn., 415; *Waller* v. *Graves*, 20 Conn., 305.

This case is reserved, and we will proceed to consider whether, under the circumstances, a new trial should be granted.

If we were to make a rigid application of the rules which govern the Superior Court in civil causes, we should doubtless advise that a new trial should be denied; but in a case where human life is at stake, justice, as well as humanity, requires us to pause and consider before we apply those rules in all their rigor. The counsel for the State invoke the aid of two of those rules especially, and urge with great ability that the court should adhere to them and refuse a new trial.

In the first place it is insisted that the new evidence might have been discovered and produced on the trial by the use of reasonable diligence.

The question of due diligence is in all cases to be determined upon consideration of all the circumstances of the case. Thus the issue, the position of the parties, and the nature of the evidence, are all material.

The charge was murder in the first degree. The homicide was admitted; the vital question being whether the prisoner was in a condition of mind to form a deliberate purpose to take life. The defense claimed that he was not, for the reason that he was insane; indeed it was claimed that he was not criminally responsible at all. The inquiry therefore was not merely whether he was irresponsible, but assuming his responsibility, the question still remained, was his mind so far impaired as to raise the presumption that he could not form a wilful, deliberate and premeditated purpose to take life?

The burden was on the state to show not only that the prisoner was capable of committing a crime, but that he was in

a condition to plan and execute a cool, deliberate murder. The degree of malice essential to murder in the first degree, like the act of killing, or any other material fact, must be proved beyond a reasonable doubt, or the jury ought not to convict of the greater offense. Upon that point the jury might have entertained a reasonable doubt, and at the same time may have been satisfied that the act was a crime and that it was their duty to convict of murder in the second degree.

In respect to the parties, we observe that there is a marked distinction between this case and a civil cause where sanity or insanity is the issue. Take for illustration the ordinary case where the question is whether a testator had capacity to make a will. In such a case the parties interested are themselves sane, and have their liberty. In the case before us, the party in interest, and whose life depends upon the result, is a close prisoner, and for the purposes of the question we must assume that he is insane. It is certainly reasonable to require a greater degree of diligence in the former case than in the latter. To this may be added the fact that the prisoner is a foreigner, and is destitute of means, and that his counsel was a young man of limited experience.

The new evidence is mostly from men with whom the prisoner's acquaintance was slight. Some of them testify to transactions which took place a long time before the homicide. The transactions themselves were of such a nature that they were probably forgotten by the prisoner, or, if not forgotten, he did not appreciate their importance; and they were unknown to his counsel until after the trial

In view of all the circumstances it does not seem to us that there has been such negligence, either in himself or his counsel, as ought to deprive him of the benefit of the new evidence. The rule we are considering, which is a salutary one in its application to civil causes, becomes harsh and oppressive when it requires the sacrifice of a fellow-being, who may possibly in the sight of God be innocent of the crime with which he is charged.

In the second place, it is insisted that the new evidence is merely cumulative, and that a new trial should be refused for that reason.

Andersen *v.* The State.

Cumulative evidence, as defined by this court in *Waller* v. *Graves*, 20 Conn., 305, is "additional evidence of the same general character, to the same fact or point which was the subject of proof before." "But (the court adds) that evidence which brings to light some new and independent truth of a different character, although it tend to prove the same proposition or ground of claim before insisted on, is not cumulative within the true meaning of the rule."

In some sense, perhaps, it may be said that the facts brought to light by the new evidence are of the same general character as those sworn to on the trial—facts and circumstances tending to prove that the prisoner was of unsound mind. In another sense however they are different, as they furnish additional grounds for believing the existence of insanity in one form or another. Moreover evidence merely cumulative, if it have the effect to render clear and positive that which was before equivocal and uncertain, will justify the granting of a new trial. *Waller* v. *Graves*, supra, where that principle was applied.

In a case where life is at stake, if the new evidence, in addition to that already produced, will have the effect to raise a reasonable doubt whether the prisoner was in a condition of mind to commit the highest crime known to our law, and to incur the severest penalty which human law can inflict, it ought not to be regarded as cumulative so as to prevent another trial.

Again, unsoundness of mind is a fact which is not susceptible of direct proof. In many cases, especially of partial insanity, or where the moral faculties alone are affected, it can only be established by a series of facts and circumstances, and acts and conduct of the subject, extending over a considerable period of time. A large number of acts indicating insanity will generally produce a greater effect upon the mind of the trier than a smaller number; and in the present case we should not dare to say that the new evidence, coming, as it does, from highly respectable and very intelligent witnesses, ought not to have the effect of producing a different result.

We do not care to state at length the testimony in the case.

It seems that the prisoner notified his employers that he should give up his work, and they employed others to take his place. He then objected, saying he.had not given it up, and insisted that Mr. Norton and Mr. Nettleton, who had been employed in his place, should not go to work. Being a poor man and having a family to support, he became very much excited and caused some trouble in the shop, for which he was arrested. This was on Thursday. His trial was to take place on Saturday. Saturday morning he armed himself with two revolvers, went to the shop, and commenced firing—some of the time with a revolver in each hand—and in a few moments he had shot at no less than four different persons. One of the men who took his job, Mr. Norton, was shot at and wounded; the other, Mr. Nettleton, although close by the prisoner, was not molested. Some ten or twelve persons were present, and the affair occurred in broad day-light. Of course there was no attempt at concealment, and hardly a possibility of escape. If the prisoner reflected at all he must have known that detection and punishment were certain.

The motive for the crime seems to be wholly inadequate. His employers had only accepted his resignation, and the men employed in his stead had only offended in consenting to be employed. How a rational man could coolly and deliberately plan a murder of these parties, or of any one of them, as a remedy for any existing evil, is difficult to conceive. Revenge, the only other possible motive, rests upon a slight provocation.

The indiscriminate nature of the attack makes the whole matter still more mysterious and incomprehensible. The only man killed was one with whom he had had no trouble, and the testimony does not show that he owed him any grudge. This indicates not so much a deliberate intention to take the life of some one who had injured him, as a disposition to destroy life generally, it mattering little to him who the unfortunate ones might be. "In a case of homicide the relations existing between the parties are worthy of much consideration. If the person slain were a parent, a child, a wife, or some near friend or relative, and no particular cause for the act was assigned, it might raise a fair presumption that it was due to

insane impulse.  If the individual slain be an object merely of indifference, towards whom no peculiar feelings either of friendship or enmity can be presumed to be entertained, the presumption, although much less strong, is still in favor of its being an insane act.  The mere motiveless destruction of life can with difficulty be regarded as the act of a sane mind.  If, on the contrary, a motive exist, or if feelings of enmity, originating in no delusion, be entertained towards the person slain, the presumption will be that it is a sane act." Dean's Med. Jurisprudence, 577.  We look in vain for any motive for taking Hall's life, and it is by no means clear that his death was caused by inadvertence, while attempting to take the lives of others.

As a fitting close to such a tragedy, the prisoner made two unsuccessful attempts to take his own life.  It is strange that a professed Christian, as the prisoner was—one who believes in future rewards and punishments—should deliberately imbrue his hands in the blood of his fellow-man, and then rush unbidden into the presence of his Maker and Judge, to receive the punishment due to his crimes.  In this age of the world suicide is regarded by many as conclusive evidence of insanity.  Esquirol, a celebrated French physician, who founded a lunatic asylum in 1799, which became a model for all similar institutions afterwards founded in France, and who published a work on mental maladies, thinks that in all cases the suicidal act is the deed of a monomaniac, and results from a pathological change in the brain or some part of it.  However this may be, it is probably true that homicidal mania manifests itself in self-destruction more frequently than in any other form.

In civil causes the act which is the occasion of investigating the mental condition of the actor is carefully considered.  If it is a rational act, rationally done, it is strong evidence of a sound mind; if it is an irrational act, or done in an irrational manner, it is regarded as evidence of insanity.  Making due allowance for temper and passion we see no good reason why the same rule should not prevail in criminal jurisprudence.

If so there is certainly to be gathered from this transaction some evidence of an unsound mind.

The testimony shows that the prisoner, to use the words of an expert who heard the trial, was a man of "irritable temperament, little self-control, a strange man, disappointed in business, out of work, with an increasing family and fear of poverty, and added to all that dyspepsia, and fever and ague." It also appears that he was subject to great nervous excitement, and at times to a corresponding despondency, was easily vexed and annoyed by his fellow-workmen, at one time imagining that they had poisoned the water that he drank, and that they had conspired against him for the reason that he was a superior workman and were endeavoring to deprive him of employment. In the events which immediately preceded the homicide he spoke of them as trying to kill him, and told his wife that he intended to use the pistols which she saw only in self-defense. His arrest also about that time, and being held for trial, for a breach of the peace, further excited him. It also appears that during the latter part of the year 1873, and the first part of the year 1874, he was greatly changed from what he formerly was, so much so that it was apparent to those who knew him and came in contact with him, being a subject of conversation with them. One man refused to employ him, although wanting a man in his line, because he regarded him as half crazy. Several others observing his singular conduct, and noticing the change that had come over him, also pronounced him crazy. It is also manifest that he was naturally of a quarrelsome disposition, and had a violent temper, which at times was ungovernable.

The State denied that there was in all this any indication of insanity; but accounted for it all by attributing it to bad temper, and peculiarity of temperament and disposition. Upon all the facts which were placed before the jury, giving a large part of his personal history for the last few years, Dr. Butler, the eminent physician who was for thirty years at the head of the Retreat for the Insane at Hartford, pronounced him insane. Drs. Jewett and Bacon of New Haven, two eminent physicians of large experience, pronounced him sane.

It is not our province to revise the action of the jury. As we have already seen, we have no power to do that in this proceeding. Nor are we required to weigh the evidence, except so far as may be necessary to see whether, with the additional evidence that can now be presented, another jury would be likely to render a different verdict.

The additional evidence is in substance as follows:

Judge Robinson will testify that he knew him officially on one occasion, and became satisfied that he was not a sane man; that his insanity was of a kind affecting his moral nature rather than his intellectual faculties, and rendering him, when under any excitement, unable to control himself. He believed him incapable of the wilful and deliberate intent which makes murder in the first degree.

Henry E. Pardee and John W. Alling, each while holding the office of City Attorney of New Haven, had their attention called to him officially. They will testify that they regard him as a man who, under excitement, is governed by an uncontrollable impulse; and that he is subject to excitement from trivial causes. Also that he seemed to magnify injuries far beyond their real importance, and to be governed by a morbid imagination as to their extent and even existence.

Charles P. Jourdan saw him laboring under great excitement on account of a real or fancied grievance of slight importance; and says that his excitement seemed to be uncontrollable, and of a nature different from what would be expected in a sane man under similar circumstances; so much so that he concluded that he was either drunk or crazy.

Judge McManus of Hartford saw him the day before the homicide. He was then laboring under great nervous excitement of no ordinary character; and a peculiar wildness or restlessness of eye especially attracted the judge's attention; and his appearance was not that of an ordinary sane man under like circumstances.

Alexander Troup knew him eighteen months. He will say that he seemed to be laboring under a morbid delusion as to fancied injuries, which were without foundation, and that he was entirely uncontrollable when laboring under excitement.

He seemed to be deluded with the idea that every body was conspiring against him to injure him. He came to the conclusion that he was insane.

James Gallagher and Ratcliffe Hicks are also named as witnesses, and all the witnesses will state more in detail their means of knowledge and the facts on which their opinions are based.

Dr. Linguist, who treated him professionally, will say that he noticed indications of a morbid tendency in his mind which is frequently followed by insanity.

It is not our purpose, nor is it our duty, to apply this evidence to any one of the numerous phases of insanity recognized by courts of justice. Indeed it is not necessary for us to assume that it does or may, in the opinion of the jury, establish the fact that the prisoner is not criminally responsible for his acts. The evidence may fall far short of this, and still satisfy a jury that he ought not to suffer the penalty of the crime of which he was convicted.

Perhaps the most usual form of insanity which comes under the cognizance of courts of justice, is derangement, total or partial, of the intellectual faculties. There is some evidence in this case indicating delusion, which is the usual, and perhaps an essential, manifestation of this form of insanity. Should the jury be satisfied of its existence they would probably acquit the prisoner upon that ground. As to the sufficiency or insufficiency of the evidence for that purpose we express no opinion.

Another form of insanity is a derangement of the moral faculties. In this there is usually, though not always, an entire absence of delusion. Moral mania, like intellectual, is of two kinds, partial and general. Instances of the former, are *cleptomania*, or propensity to steal, *pyromania*, or propensity to destroy by fire, and *homicidal mania*. General moral mania "consists in a general exaltation, perversion, or derangement of function, of all the affective or moral powers. Those who have observed and written upon this form of mental alienation, unite in describing those who labor under it as persons of singular, wayward and eccentric character. Their

antipathies are violent, and suddenly taken; their suspicions unjust and severe, and their propensities strong and eagerly indulged. They are generally proud, conceited, ostentatious, easily excited, and obstinate in the maintaining of absurd opinions." Dean's Medical Jurisprudence, 496. On page 497 is a quotation from Hoffbauer, in which it is described as "a state in which the reason has lost its empire over the passions, and the actions by which they are manifested, to such a degree that the individual can neither repress the former nor abstain from the latter. It does not follow that he may not be in possession of his senses, and even his usual intelligence; since, in order to resist the impulses of the passions, it is not sufficient that the reason should impart its counsels; we must have the necessary power to obey them. The maniac may judge correctly of his actions, without being in a condition to repress his passions, and to abstain from the acts of violence to which they impel him."

The subject of moral mania will generally be found to have experienced a great change in temper, disposition and moral qualities, either sudden and dating from some reverse of fortune or loss of dear friends or relatives, or gradual and imperceptible, consisting in an exaltation or increase of peculiarities which were always natural or habitual. The moral maniac will rarely exhibit any signs of derangement in his conversation. He will often be regular, systematic and methodical in all his business transactions, and to all appearance regular in the use of his intellect. One man sees him in business transactions only, or converses with him when he is free from excitement, and he does not hesitate to pronounce him perfectly sane; another has an opportunity to witness some strange and unaccountable eccentricity of conduct, totally irreconcilable with the possession and exercise of a sound mind. The facts to which these two witnesses would testify are apparently contradictory; and yet they are perfectly consistent when the form of the malady is known. The *conversation* discloses intellectual mania, and the *conduct* moral mania. We will not undertake to say that the conduct above referred to as characterizing one who is afflicted with moral

mania is exactly the conduct of the prisoner; but the description is certainly applicable to some extent, and when we consider that the manifestations of insanity are as various as characters and temperaments, that the insane man is not careful to walk in the footsteps of those who have gone before him, but wanders through moral or intellectual darkness, or both, and makes his own path, we are by no means clear that a jury might not with perfect propriety find that the prisoner is morally insane. Upon this point the newly discovered evidence bears with peculiar force, and materially strengthens the evidence given upon the trial. It is true that courts have hitherto been slow to recognize this form of insanity as an excuse for crime; nevertheless that it exists, is well understood, and, in some cases, is clearly defined by medical and scientific men, cannot be denied.

It is not our purpose either to ignore or recognize this form of insanity as an excuse for crime. The question is not whether an act committed under its influence is criminal; whether the actor should be punished or be exempt from punishment; but whether he is a proper subject of capital punishment. If it be conceded that one afflicted with it never loses the power to distinguish between right and wrong, and is at all times master of himself and may control his actions, still his mind may be enfeebled and the power of his will weakened, so that he will readily yield to the influence of temptation or provocation without that wilful, deliberate and premeditated malice which is essential to constitute murder in the first degree. The jury therefore ought to consider moral mania, if satisfied of its existence, in determining the degree of crime, and give it such weight as it is fairly entitled to under the circumstances.

There is another view which may, and we think should, be taken of this case. It cannot be denied that the prisoner is a man of an excitable temperament, a quarrelsome disposition, morbidly jealous and suspicious, imagining evils where none exist, or at least magnifying those which do exist, and when dyspepsia or fever and ague is upon him, or there is any other exciting cause, like business troubles, disappointments,

&c., all these propensities are intensified and brought into greater activity. Such traits are the seeds which are likely to germinate and ultimately to result in confirmed insanity. Now, assuming that the disease had not yet reached that stage, but, on the contrary, that the prisoner could not only distinguish between right and wrong, but had also the power of self-control which would enable him to do the right and refrain from doing the wrong, is it not quite probable from this evidence that the prisoner was laboring under an unusual and unnatural excitement, brought upon him by the circumstances in which he was placed and the atmosphere which surrounded him, and that by reason thereof his mind was in such a state and condition that he was incapable of committing murder in the first degree? May it not be possible that the man's unfortunate temper, excited by what he regarded as repeated and successive provocations, held all his faculties, moral and intellectual, in subjection to some extent, so that he was incapable of reasoning correctly, or rightly apprehending his relations to others? And that too, not only while he was under the direct and immediate influence of the exciting causes, but also after he had had time and opportunity for reflection, continuing even until after the commission of the homicide? The common law is considerate of those who take life in the heat of passion, but makes it a capital offense to take life after time enough has elapsed for the passions to cool, making no allowance for differences in temper and disposition. Under our statute, which divides murder into two degrees, there is ample opportunity to make some allowance for those cases where, from any cause, excitement and passion continue beyond the limits allowed by the common law, and impel to the commission of crimes which would not be committed in cooler moments. Reason and humanity require that this should be done. This may be, and we are inclined to think that it is, a case in which the jury would be justified in regarding the distinction just adverted to.

Upon a careful consideration of all the evidence in the case, including the new evidence, it seems to us very doubtful whether the prisoner is a proper subject of capital punishment. We therefore advise the Superior Court to grant a new trial.

In this opinion FOSTER and PARDEE, Js., concurred; PARK, C. J., and LOOMIS, J., dissented as to the propriety of granting a new trial for newly discovered evidence.