## STATE vs. EDWIN HOYT.

By statute murder by any kind of willful, deliberate and premeditated killing is made murder in the first degree. Actual malice is essential to this degree of murder, but will be inferred from the willful, deliberate and premeditated character of the act.

Upon a trial for murder the Attorney for the State offered evidence that the prisoner had, thirteen years before the homicide, declared that he would like to put a ball through the head of the man murdered, with evidence of declarations of a like character, made one, three and four years before the homicide. Held that the remoteness of time of the declaration went solely to its weight as evidence, not to its admissibility.

Proof of the insanity of a person accused of crime is a matter of defence wholly and the burden of proving it rests upon the accused.

Standard medical works on insanity may be read to the jury by the counsel for the accused, upon the question of his insanity. A long practice has established this rule in this state.

The counsel for the accused in reading to the jury a case from the regular law reports in which the question of insanity is discussed, is not confined to the opinion of the court upon the questions of law, but may read the statement of the facts of the case and the comments upon them.

It is no error for the court to pronounce sentence of death upon a prisoner upon a conviction of murder, before passing upon a motion for a new trial that has been filed. The statute which requires the fixing of the day of execution at least one year from the conviction, is itself a sufficient stay of execution for the purposes of the motion.

INDICTMENT for murder in the first degree, in the Superior Court in Fairfield County. The case was tried to the jury, on the plea of not guilty, before *Carpenter* and *Sanford, Js.*

Upon the trial the Attorney for the State, for the purpose of proving malice, offered the testimony of one Truman Favreau, who testified that about thirteen years before, in a conversation between the prisoner and himself, the prisoner said that he would like to put a ball through his father's heart if he thought it would penetrate, but that his heart was so much harder than the ball that he thought it would not penetrate it; that to this remark the witness replied "Pshaw;" to which the prisoner replied, "I mean what I say." To this evidence the prisoner objected on the ground that it was too remote in time. The Attorney for the State claimed that he should follow the testimony up with evidence of a similar character, from time to time down to the time of the homicide. The court overruled the objection and admitted the evidence, to which ruling the prisoner excepted. The Attorney then offered testimony to prove that on several occasions afterward —one about four years before the homicide, one about three years before, and one in March, 1877, the accused had made threats against his father.

The Attorney offered no evidence before resting his case on the question of insanity. The prisoner offered but a single witness, a physician, as an expert on that subject. After the prisoner had rested his case, the Attorney for the State offered by way of rebuttal the testimony of a single witness as an expert. To this evidence, at this stage of the case, the prisoner objected, on the ground that it should have been offered in chief; but the court overruled the objection and admitted the evidence.

The counsel for the prisoner claimed that at the time of the commission of the homicide he was morally insane. On this part of the case, in making the opening argument for the defence, they offered to read to the jury certain portions of the treatise entitled "Ray's Medical Jurisprudence of Insanity," containing the author's opinion and views on the subject of moral insanity. To this the Attorney for the State objected, on the ground that it was but an opinion of the author as an expert, not under oath, and not subject to cross-examination, and the court sustained the objection.

The counsel for the prisoner also in his argument proposed to read to the jury the entire case of *The State* v. *Andersen*, 43 Conn. R., 514. Objection was made by the Attorney for the State to the reading of the facts in the case, as the same might tend to confuse the jury and divert their minds from the facts in the case on trial. The court sustained the objection, but gave permission to counsel to read from the opinion of the court in that case upon any question of law therein contained having any application whatever to the case on trial, and thereupon the counsel for the prisoner did read to the jury such portions of the opinion as they chose to read, except the statement of facts contained in the opinion. To this ruling of the court the counsel for the prisoner excepted.

The Attorney for the State claimed that in every charge of murder, the fact of killing being first proved, the law implies malice. But the counsel for the prisoner claimed that under the statute, to obtain a conviction of murder in the first degree, malice must be proved, and that malice could not be implied from the killing alone. The court charged the jury as follows: "The killing must be with malice aforethought. Malice may be implied from the killing and the circumstances surrounding the act, so that it is not necessary that the state should prove malice by direct evidence. If a willful, deliberate and premeditated killing is proved the law will imply malice."

The jury returned a verdict of guilty of murder in the first degree. The Attorney for the State thereupon moved that sentence be pronounced upon the prisoner. The prisoner's counsel then presented a motion for a new trial, and objected to sentence being pronounced pending the motion, and until the final determination thereof, claiming that it was in law a supersedeas of judgment and execution, and moved that sentence be suspended pending the motion and until its final determination. The court denied the request and sentenced the prisoner to be hanged on the 24th day of October, 1879.

The prisoner filed his motion for a new trial, for errors in the rulings and charge of the court, and also a motion in

error for the error of the court in pronouncing sentence after the motion for a new trial had been filed.

*W. F. Taylor* and *H. S. Sanford*, in support of the motions.

1.   The claim of the state, that in every charge of murder, the fact of killing being first proved, the law implies malice, was erroneous.   The statute does not undertake to define *murder*.   The crime remains defined by the common law—as that common law definition has been explained, and as it now stands wherever the common law prevails.   Nowhere at the present day, it is submitted, does the law imply malice from the killing alone.   Under the extraordinary circumstances of this case, therefore, it would seem to be the clear right of the prisoner to have such instruction given to the jury precisely as the request was framed.   The court, however, told the jury "that it was not necessary that the state should prove malice by direct evidence ; if a willful, deliberate and premeditated killing is proved, the law will imply malice."   But the court did not superadd to this instruction, as it should have done, any definition of murder as it stands at common law.   It is respectfully submitted that the court should have also added that the jury should first find murder as defined in the request of the defendant, before considering the degree.

2.   The threat to which Favreau testified was far too remote in time.   1 Taylor on Ev., § 298.

3.   The state should not have been allowed to introduce expert testimony to prove sanity in rebuttal.   *Jaques* v. *Bridgeport Horse R. R. Co.*, 41 Conn., 61.

4.   Since in this state the jury are the judges both of the law and the fact, it would seem to be proper to read to them legal works.   How else could they be properly instructed ?   They are not bound to take the law from the court.   In a civil case could not the law be read to the court from a treatise ?   In a will case, for instance, could not this very work be read to the court ?   If so, was there not greater need that the jury should have the benefit of it ?   The objection that it was but an opinion, not under oath or cross-examination, has no

weight, for the work was not offered as evidence. *State* v. *Buckley*, 40 Conn., 248.

5. We insist, too, that it was the clear right of the accused to have the entire report of the Andersen case, or at least the whole opinion read. An opinion cannot be clearly understood except in connection with the facts in a case. To separate the opinion from the facts on which it is based, is to destroy its force. In *Baldwin's Appeal from Probate*, 44 Conn., 37, the distinction between civil and criminal cases is broadly pointed out and preserved.

6. On the motion in error, we submit that the judgment of the court could not be pronounced pending the motion for a new trial. That motion, when a rule is allowed to show cause why a new trial should not be had, it would seem must prevent a judgment until its decision. If the motion be granted, nothing is decided respecting the judgment. No judgment is reversed or in any manner dealt with. The case is not remanded. Why? For the simple reason that no judgment has passed. The motion operates as a stay, or in arrest. The Superior Court allows the motion, grants the rule, and reserves the question for the Supreme Court for its advice.

*J. H. Olmstead*, State's Attorney, and *E. L. Scofield*, contra.

1. There was no error in the charge of the court, that if a willful, deliberate and premeditated killing was proved, the law would imply malice. 2 Wharton's Crim. Law, §§ 944, 945; Wharton on Homicide, §§ 38, 39; *State* v. *Johnson*, 40 Conn., 143; *Andersen* v. *The State*, 43 id., 518.

2. The testimony of Favreau, in connection with the evidence that on several occasions afterwards the accused made threats against his father of a similar character to those made in the presence of the witness, was admissible for the purpose of proving malice. It showed that the accused entertained a malicious intent toward his father, likely to instigate him to the commission of the offence in question. 1 Wharton's Crim. Law, § 635; 2 id., § 946; *Bartram* v. *Stone*, 31 Conn.,

State *v.* Hoyt.

159, 163.  Malice once proved is presumed to continue unless there is evidence of the abandonment of the wicked purpose. 2 Wharton's Crim. Law, § 949.  The law fixes no time before the commission of the act when threats of this character shall be admissible.  If they are remote from the act, that may raise a question for the jury, as to the weight they should receive in determining the question of malicious intent, but that is all.

3.  It was not necessary for the prosecution to prove as a specific fact the sanity of the accused at the time of committing the homicide.  Every person of mature years is presumed to be competent to commit crime and to be of sound mind.  *State* v. *Johnson*, 40 Conn., 139, 142.

4.  The court ruled properly in refusing to permit the counsel for the accused to read to the jury from "Ray's Medical Jurisprudence of Insanity," containing the author's opinions and views of the subject of moral insanity.  1st. Because the matter therein contained was not a matter of law.  2d. It being nothing more than a matter of fact, it could not be submitted to a jury except under the sanction of an oath.  *Baldwin's Appeal from Probate*, 44 Conn., 40; *Commonwealth* v. *Wilson*, 3 Gray, 337; *People* v. *Anderson*, 44 Cal., 65; *Carter* v. *State*, 2 Carter, 617.

5.  The court ruled properly in refusing (after objection made by the Attorney for the State) to permit counsel for the prisoner to read to the jury the entire case of *Andersen* v. *The State*, 43 Conn., 514.  *Baldwin's Appeal from Probate*, 44 Conn., 40.  The facts in that case were unlike the present and had no possible bearing thereon, while the reading of the statement of them might tend to confuse the jury and divert their attention from the case on trial.

6.  There was no error in the court's proceeding to pronounce sentence of death upon the defendant, after he had made and presented to the court in writing his motion for a new trial, before passing upon the same, and during the pendency thereof.  1st. Sentence should have been pronounced before the allowance of the motion for a new trial.  *Lockwood* v. *Jones*, 7 Conn., 439.  2d. By statute sentence must

be pronounced within ten days from date of conviction, unless there be a stay of execution by order of the court. Acts of 1878, chap. 15.

PARDEE, J. The statute provides that "all murder perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, * * shall be murder in the first degree." Under this classification actual express malice must be proved in order to constitute murder in the first degree. The proof may be by direct testimony as to the repeated declarations of the accused that he entertained the intent and would carry it into execution, or it may be that equally satisfactory and convincing proof may be found in acts of preparation with deliberation, in coolness in execution, and in subsequent declarations.

Counsel for the accused requested the court to charge that malice could not be implied from the killing alone. The court charged that "if a willful, deliberate and premeditated killing is proved the law will imply malice." This was in effect to say that if the proof satisfied each juror beyond a reasonable doubt that it had been the deliberate will and intent of the accused to take the life of his victim, they would have legal ground for a verdict of murder in the first degree. This furnishes the accused no ground for complaint.

As tending to prove malice on the part of the accused towards his victim at the time of the homicide, the state offered evidence tending to prove that thirteen years since he had said that "he would like to put a ball through his father's heart if he thought it would penetrate, but his heart was so much harder than the ball that he thought it would not penetrate it." This was received against the objection that it was too remote in time, and was followed by evidence as to threats made one, three and four years since. The objection does not properly go to the admission, but to the weight of the testimony. No rule of limitation runs against evidence as to malice in such cases. Jurors are presumed to know, and the court from abundant caution will remind them, that with time hatred and revenge usually die out of the heart; that a

threat unrepeated and unexecuted for thirteen years probably comes at last to represent a passion of little strength; that a threat repeated from time to time during as many years and at last fully executed may represent a passion of great strength.

The accused introduced a witness, an expert, upon the point of insanity, and the court permitted an expert to testify upon the same subject in behalf of the state by way of rebuttal. The accused complains of this, and urges that the state should have introduced this evidence in chief. The complaint is without foundation. The law presumes every person of mature years to be of sound mind and competent to commit crime. If the defence be insanity, it is to be proved substantially as an independent fact, and the burden of proof is on the accused. Upon this issue he goes forward and the state rebuts.

Upon the trial a physician, an expert in the science of insanity, was introduced for the purpose of proving that the accused was of unsound mind at the time of the homicide. As a part of his argument upon this branch of the case counsel for the defence asked permission to read to the jury some extracts from a book entitled "Ray's Medical Jurisprudence of Insanity." Upon the objection that this was an opinion not under oath, the court refused permission to read. Of this the accused complains.

The plea of insanity interposed in behalf of persons indicted is supported by the testimony of persons who by study of books and men have entitled themselves to speak as experts in that science. By way of vindication of their right to be heard as instructors of the jury, they usually preface their testimony by a statement of the extent of their experience in the treatment of persons afflicted with disease of the mind and the time given to the reading of treatises upon insanity written by men of wide experience and acknowledged ability in the treatment of such diseases; their opinion is the result of observation of men and reading of books. And in this jurisdiction for a long series of years counsel have been permitted to read to the jury, as a part of their argument

State *v.* Hoyt.

upon this part of their case, extracts from such treatises as by the testimony of experts have been accepted by the profession as authority upon that subject; such treatises as have helped to form the opinion expressed by the expert. The practice by repetition has hardened into a rule; a rule, upon the continued existence of which counsel for the accused in the case before us had a right to rely; the abrogation of which by the ruling complained of may have been a surprise. The question is not, shall such reading be now for the first time permitted; it is, shall it now for the first time be forbidden without notice. We think that privileges hitherto granted to persons in like circumstances with the accused should not be denied to him, to his possible prejudice.

Counsel for the accused asked permission to read, as a part of his argument to the jury upon the same point, the opinion of this court in *State* v. *Andersen*, 43 Conn., 514. He was permitted to read from it so far as questions of law are therein determined, but was not permitted to read in connection therewith the statement of the facts of that case therein contained. He complains of this restriction.

In that opinion the court says as follows:—"We will not undertake to say that the conduct above referred to as characterizing one who is afflicted with moral mania is exactly the conduct of the prisoner; but the description is certainly applicable to some extent, and when we consider that the manifestations of insanity are as various as characters and temperaments, that the insane man is not careful to walk in the footsteps of those who have gone before him, but wanders through moral or intellectual darkness, or both, and makes his own path, we are by no means clear that a jury might not with perfect propriety find that the prisoner is morally insane. Upon this point the newly discovered evidence bears with peculiar force and materially strengthens the evidence given upon the trial. It is true that courts have hitherto been slow to recognize this form of insanity as an excuse for crime; nevertheless, that it exists, is well understood, and in some cases is clearly defined by medical and scientific men, cannot be denied."

State *v.* Hoyt.

The statute provides that "the court shall state its opinion to the jury upon all questions of law arising in the trial of a criminal cause, and submit to their consideration both the law and the facts, without any direction how to find their verdict." The jury having statutory power to determine the law of his case, the accused had the right to read to them the determination of this court upon points affecting him, in such manner as to give them the most complete knowledge of its precise scope and meaning; and we think that would be best accomplished by presenting the opinion in its integrity. Of course, the facts to a greater or less degree illustrate the statement of the law, and in some paragraphs the two are so closely interwoven that a separation would weaken and perhaps destroy the force of the latter.

In his motion in error the accused specially assigns as error that the court pronounced sentence of death upon him before ruling and passing upon the written motion for a new trial which he had presented.

There is no error in this. By our practice the judgment is not necessarily suspended by the presentment of a motion for a new trial. Usually final judgment is rendered and afterwards the motion is allowed. The statute, in forbidding the infliction of capital punishment within twelve months after conviction, stays the execution in this case.

A new trial is advised.

In this opinion GRANGER and MARTIN, Js., concurred.

LOOMIS, J. The ruling complained of, by which counsel were prevented from reading to the jury during the argument from "Ray's Medical Jurisprudence of Insanity," the author's opinions and views on the subject of moral insanity, I regard as correct in principle and in full accord with the best considered legal authorities.

1. It was correct in principle, because the subject matter belonged exclusively to the realm of fact and not of law. It was a matter of evidence to be given to the jury under the sanction of an oath, and subject also to that other most important test of truth, the right of cross-examination. This

wholesome principle ought not to be sacrificed except for most cogent reasons. And what reason is given in this instance? Only that a different practice for some years has prevailed. Not a practice ever sanctioned, directly or indirectly, by this court, nor one which has generally been considered by the judges on the circuit as of binding force in law, but rather as subject to the discretion of the presiding judges; a discretion which, it is true, has been usually exercised in favor of the accused in capital trials. But, as I understand it, the practice has been under important limitations not existing, or at least not stated, in this case.

It has been usual first to inquire of some witness on the stand as an expert, whether the book to be afterwards read from was recognized by experts as a standard authority on the subject. Were this foundation laid, the practice of reading would be shorn of most of its mischief. And so it would if it was subject to the discretion of the court. But the majority opinion unfortunately recognizes no discretion in the court. Otherwise no new trial would have been granted on this account, for error cannot be predicated of matters of discretion.

It is easy to see what mischief may result from an unrestricted license to read such books as counsel choose to read, if only they relate to the case. Books may be crazy as well as men, and all sorts of theories relative to responsibility for crime are advocated in books.

I do not contend that the book offered in this case was of this class; I concede it to be on the contrary a work of high repute. But I have a right to test the consequences of this departure both from principle and practice by the above supposition. Who is to decide what books may be read if you take away the discretionary power of the court, unless indeed you restore what I contend was a feature of the practice referred to, namely, that a foundation must first be laid for the reading in the manner I have stated. It may be suggested that there was in the present case no need of having any expert testify as to the authority of "Ray's Medical Jurisprudence of Insanity," because it was so well known. But the

principle required it, because courts do not take judicial notice of standard medical or scientific works, and the standard works of to-day may not long continue such, owing to new discoveries and advancing knowledge.

2. Again, I contend that the ruling of the court below was in accordance with the best legal authorities.

The case of *Commonwealth* v. *Wilson*, 1 Gray, 338, is directly in point. It was an indictment for murder, and the sole ground of defence was insanity. The defendant's counsel in opening the case for the defendant proposed to read to the jury definitions of insanity from works of established reputation on the subject, and contended that books written by lawyers were admissible, even·if the court should hold that treatises of medical writers were not. And he referred for instances in which such works had been permitted to be read to the jury, to Rogers's Trial and Townsend's State Trials. Shaw, C. J., in giving the opinion of the court said: "Facts or opinions on the subject of insanity, as on any other subject, cannot be laid before the jury except by the testimony under oath of persons skilled in such matters. Whether stated in the language of the court or of the counsel in a former case, or cited from the works of legal or medical writers, they are still statements of fact, and must be proved on oath. The opinion of a lawyer on such a question of fact is entitled to no more weight than that of any other person not an expert. The principles governing the admissibility of such evidence have been fully considered by this court since the trial of Rogers; and the more recent English authorities are against the admission of such evidence." Citing *Collier* v. *Simpson*, 5 Car. & P., 74; *Cocks* v. *Purday*, 2 Car. & Kirw., 270; 1 Greenl. Ev., § 440, note.

In *Asworth* v. *Kittredge*, 12 Cush., 193, the same learned judge, in giving the opinion of the court, used the following language, which is pertinent to the case at bar:—"It was not competent for the counsel for the plaintiff, against the objection of the other side, to read medical books to the jury. It was formerly practiced rather by general indulgence and tacit consent of the parties than in pursuance of any rule of law;

but it has been frequently decided that it is not admissible, and we now consider the law to this effect well settled, both upon principle and authority. Where books are thus offered they are in effect used as evidence, and the substantial objection is that they are statements wanting the sanction of an oath; and the statement thus proposed is made by one not present, and not liable to cross-examination. If the same author were cross-examined, and called to state the grounds of his opinion, he might himself alter or modify it, and it would be tested by a comparison with the opinions of others. Medical authors, like writers in other departments of science, have their various and conflicting theories, and often sustain and defend them with ingenuity. But as the whole range of medical literature is not open to persons of common experience, a passage may be found in one book favorable to a particular opinion, when perhaps the same opinion may have been vigorously contested, and perhaps triumphantly overthrown, by other medical authors, but authors whose works would not be likely to be known to counsel or client, or to court or jury. * * If it be said that no books should be read except works of good and established authority, the difficulty at once arises as to the question what constitutes good authority; more especially whether it is a question of competency to be decided by the court, whether any particular book shall be received or rejected, or a question of weight of testimony, so that any book may be read, leaving its weight, force and effect to the jury. Either of the alternatives would be attended with obvious, if not insuperable objections."

The case of *Washburn* v. *Cuddihy*, 8 Gray, 430, is equally pertinent.

The recent case of *Commonwealth* v. *Sturtivant*, 117 Mass., 122, shows how firmly the Massachusetts courts adhere to the principle. It was an indictment for murder, in which it became important for the prosecution to show that certain blood stains were from human blood. In reply a witness called by the defence, an expert on the subject of blood stains, having said that in his opinion it was impossible to determine with certainty, in the case of a stain that had been

State *v.* Hoyt.

dried upon clothing seven days, whether it was human blood, was asked if he coincided with the views of Dr. Taylor, as expressed in Taylor's Medical Jurisprudence, which book was passed to the witness. The counsel then proposed that a certain paragraph upon that point from the book, with which the witness concurred in opinion, should be read to the jury by the witness, but the court excluded it, and the Supreme Court approved of this ruling as in accordance with a well settled rule.

In *Collier* v. *Simpson*, 5 Car. & P., 73, it is held that medical books are not admissible evidence; but that medical men may give their opinions as witnesses, which opinions may in a measure be founded on the contents of standard medical books as a part of their general knowledge. This principle was quoted with approval in *Carter* v. *The State*, 2 Carter's Ind. R., 617.

Standard treatises on evidence and other branches of the law maintain the doctrine we are contending for. In 1 Greenl. Ev., (12th ed.,) § 440 *a*, it is said that "particular facts relevant to the cause cannot be proved by reading from a published book, nor can medical books be cited by counsel." See also 2 Taylor's Ev., § 1279; 2 Graham & Waterman on New Trials, 686, 7.

In *Luning* v. *The State*, 1 Chandler's R., 178, (Wisconsin,) it was held no error in the court below to refuse permission to counsel to read medical books, as it was a matter within the control and discretion of the court. It was also held in *Wade* v. *De Witt*, 20 Texas, 398, to be "better for the administration of justice and the protection of the rights of parties that this matter be regulated by judicial discretion, rather than left to the unlimited discretion of counsel governed by the powerful motives of interest and ambition."

The other ground for a new trial is, that the court restricted the reading of the case of *State* v. *Andersen*, 43 Conn., 514, to matters of law therein stated, excluding the facts of that case. And the record shows that the counsel did read freely from the opinion, omitting merely the facts.

Ordinarily the argument that the law of a case cannot be well understood without the facts would be unanswerable.

But the case cited was peculiar. It was a petition for a new trial for newly discovered evidence, and as such in great measure addressed to the discretion of the court. And, properly speaking, there were no propositions of law growing out of and limited by the facts of the case. The petition of course presented fully the evidence as previously given on the trial, together with that claimed as newly discovered; but there is nowhere a conclusion of law that the verdict first given on the evidence was wrong, or that the new evidence would, in law, change the result. CARPENTER, J., in giving the opinion, on page 523 says:—"It is not our province to revise the action of the jury. As we have already seen, we have no power to do that in this proceeding. Nor are we required to weigh the evidence, except so far as may be necessary to see whether, with the additional evidence that can now be presented, another jury would be likely to render a different verdict."

In the discussion of that case the court gives the names of many witnesses, with a detailed statement of their opinions that Andersen was insane, and the reasons stated by them for such opinions. The jury in the present case surely had no right to hear that testimony, and no business whatever with the reasons given by those witnesses why they thought Andersen insane, even though the reasons as given would seem to apply equally to Hoyt. I cannot well conceive anything that could be offered to a jury more irrelevant, misleading and mischievous. It does not help the matter at all to suggest that the judges in that case must have concluded that the evidence referred to might, if submitted to another jury, change the result. The jury in the present case had no right to be influenced by such a conclusion, nor had they a right to compare the weight of evidence in that case with the evidence in this case. So far as the court defined and illustrated the various species of insanity and recognized moral insanity as a defence, the defendant had the full benefit of the case referred to, and this was all he was entitled to.

I think a new trial should not be granted.

In this opinion PARK, C. J., concurred.