* Affirmed. Santiago v. State, 64 Conn. App. 67, 779 A.2d 775, cert. denied, 258 Conn. 913, 782 A.2d 1246 (2001).
The petitioner, Charlie Santiago, was convicted of one count of murder on March 2, 1995, in the March 12, 1993 death of John Barnes. He was sentenced to twenty-five years confinement. The petitioner, as of that date, was represented by Attorney *Page 131 
Frank Riccio, who turned him into the Bridgeport police department, where he was arrested. The petitioner remained free on bond until his conviction. Some time between his arrest and trial, Riccio was appointed as a special public defender in the case.
In his original petition, it was claimed on the basis of newly discovered evidence — the affidavit of Sandra Ogrinc attached to his petition — that he is entitled to a new trial. At the hearing on the petition, in addition to Ogrinc, the petitioner also presented the testimony of Riccio, Edwin Colon and Rosa Jefferson. The court allowed the petitioner to amend his petition to include those witnesses, which amended petition is dated September 15, 1999.
Before dealing with the facts of this case, the court will set forth the often repeated principles of law governing this type of petition. In a petition for a new trial based on newly discovered evidence, the petitioner has the burden of proving that the evidence was in fact newly discovered, that it could not have been discovered and produced at the former trial by the exercise of due diligence, that it is not merely cumulative and that it is likely to produce a different result in a new trial. Taborsky v. State, 142 Conn. 619, 623, 116 A.2d 433 (1955);Krooner v. State, 137 Conn. 58, 60, 75 A.2d 51 (1950); Reilly v. State,32 Conn. Sup. 349, 354, 355 A.2d 324 (1976). The primary test to be utilized is whether an injustice was done and whether it is probable that on a new trial a different result would be realized. The function of the court is to determine whether the evidence presented at the hearing considered with the evidence presented at the original trial warrants the granting of a new trial. The burden of proof is always on the petitioner, and the court exercises its discretion, which cannot be reversed unless that discretion has been abused. State v. Goldberger,118 Conn. 444, 457, 173 A.2d 216 (1934). *Page 132 
This court believes that some consideration should be given to the language in Taborsky: "All of the above rules are qualified in their application to a capital case in light of the principle laid down inAndersen v. State, 43 Conn. 514, 517 [1876], that `in a case where human life is at stake, justice, as well as humanity, requires us to pause and consider before we apply those rules in all their rigor.'" Taborsky v.State, supra, 142 Conn. 623.
Citing Taborsky and Andersen, the court, Speziale, J., in Reilly v.State, supra, 32 Conn. Sup. 372, stated: "In this court's opinion, an underlying principle of Taborsky and Andersen is that in certain serious criminal cases, if it appears to the court that evidence which is adduced at the hearing on the petition for new trial could have a persuasive impact on a jury and might well be sufficient to turn the cause in favor of the applicant . . . an injustice would be done to the petitioner if a new trial is not granted even if all the traditional criteria for granting a new trial on the basis of newly discovered evidence are not satisfied." (Citations omitted; internal quotation marks omitted.)
The court cites the language in Reilly even though it believes that the traditional criteria have been established.
That having been said, and the principles set forth, this court has exhaustively reviewed the original trial transcript and the witnesses' testimony on this petition. This court has previously spent sixteen years as an assistant state's attorney, state's attorney and chief state's attorney and in excess of ten years as a judge almost exclusively on criminal matters and feels it is qualified to determine this kind of an issue. This is stated with the full recognition that putting flesh on those principles and applying them to a fact-specific case may often seem an undaunting task. Whether, in light of the newly discovered evidence, it is reasonably *Page 133 
possible or probable that a different result would be reached by a jury is not something that can be quantified with specificity, and thus it must be left to the sound discretion of the court.
The court makes one final observation before it deals with the specific facts of this case. It seems obvious to this court that the relative strength or weakness of the original trial is a factor that must be considered. In a very strong case against the petitioner, it would appear logical that the newly discovered evidence would have to be strong and significant in order to reach the conclusion that a different result in a new trial would likely result. Whereas in a less strong case against a petitioner at trial, that fact might lower the bar on what level of new evidence might lead to a different result. With that in mind, the court intends to evaluate the strengths and weaknesses of the original trial to aid in its primary task of determining whether an injustice was done and whether it is probable that on a new trial a different result would be reached.
This court is well aware that a jury found the petitioner guilty of murder and that verdict was upheld by the Appellate Court in State v.Santiago, 45 Conn. App. 297, 696 A.2d 362 (1997). Despite these facts, the court concludes on the basis of the testimony presented, that this was not a strong case for the state and the evidence was replete with inconsistencies.
The facts in this case at trial, up to a point, are not in dispute. On March 12, 1993, at approximately 12:30 p.m., the petitioner was washing his car in front of building 5 of the P.T. Barnum Apartments in Bridgeport (hereinafter apartment complex), where his aunt lived on the third floor. The weather was clear and it was obviously in broad daylight. The state called as its first witness, and its only witness to all of the circumstances, *Page 134 
Kenjatta Jenkins. Jenkins lived in building 4 of the apartment complex. He testified that he saw the victim, John Barnes, and another acquaintance of his, Bobby Paige, in the doorway of building 5 loading revolvers and putting on masks. Jenkins was asked to participate, but he declined and walked over by buildings 6 and 7. He then saw them approach the petitioner with their guns drawn and rob him, taking his wallet, personal effects and car keys at gun point. Jenkins said that only two people approached the petitioner. At or about this time, he claims, the petitioner yelled to someone on the third floor of building 5 in Spanish and then walked around the building to a point between buildings 4 and 5. Jenkins testified that at this time Paige merely walked away from the area while Barnes was in the petitioner's vehicle, searching it. Just prior to that, Jenkins testified that Barnes had told Paige to "off" the petitioner which means "shoot him." By this time, Barnes was driving away in the petitioner's car when the petitioner emerged from the side of the building with a rifle like weapon and began firing at everybody on the drive with bullets flying off buildings and over people's heads. He saw no altercation between the petitioner and either Paige or Barnes. On March 15, 1993, Jenkins went to police head-quarters where he gave a statement, and he admitted that by that time he was aware that Paige had already disclosed that he, Jenkins, had the petitioner's money. His testimony echoed his statement.
Contrast that testimony now to the testimony of Paige, who was called as a defense witness. He claims that at the time of this incident he was going to his home in building 10 of the apartment complex from between buildings 5 and 6 when he saw four persons approach the petitioner while he was washing his car in front of building 5. Paige testified that one of the persons was masked, one was carrying a revolver, one was carrying a rifle and he recognized one of the people *Page 135 
going through the petitioner's pockets as Jenkins. Paige also testified that the person with the rifle hit the petitioner with it in the back of his head and they fell to the ground wrestling for the rifle. He then claims that someone started shooting at the petitioner before he started shooting back with the rifle he had taken from one of the robbers. When he heard the shooting, Paige ran. He describes the man with the mask as getting into the petitioner's car and driving it off heading up the drive toward the administration building. Paige denied any participation in the robbery, although he admitted that Barnes and Jenkins were friends of his. Paige admitted that he provided the substance of his testimony to defense counsel after he found out that Jenkins had named him as one of the robbers.
The state next presented the testimony of Jamie Louise Drake Staley, its only other partial eyewitness to some of the events on March 12, 1993. Staley at trial gave her address as apartment 105 in building 10 of the apartment complex, which address is significant. She claims she was near building 11 of the apartment complex with her daughter when she saw four boys approach the petitioner who was washing his car. She did not see any of them with masks or guns. She saw the petitioner give one of the boys something from his pockets. She denied knowing any of the four boys who had approached the petitioner. She testified that she heard the petitioner say something in Spanish to a person up in a window in building 5 and that he ran around the building between buildings 4 and 5. She saw one of the boys get in the petitioner's car and drive it in the direction of the administration building. At this time the petitioner came from around the building with a gun that she described looked like an AK-47, and when he lifted the gun up, she ran into the building. She heard gunshots, but did not see who fired them. *Page 136 
The state next called as witnesses the Reverend Geraldine Clayton and Lillian Arrington, both employees of the Bridgeport board of education, who were conducting a home visitation in building 5 of the apartment complex during their lunch hour on March 12, 1993, between 12 noon and 1 p.m. As they left the building and were in the courtyard between buildings 4 and 5, they observed a young, thin female Hispanic exit building 5 with some kind of a long gun. They then observed a male Hispanic come into the area from the front of building 5 and she gave him the weapon. They immediately ran from the area but heard shots being fired.
Of particular significance was the description of the Hispanic male given by Clayton and Arrington. First, neither one could identify the petitioner at trial as that person. They each described the Hispanic as short, and Clayton described him as having a tummy. Attorney Riccio had the petitioner stand up in court, and Clayton said that was not the size of the person she saw. The court's own observation of the petitioner was that he was not short. The court on its own contacted the office of adult probation and reviewed the presentence report prepared prior to the petitioner's sentencing in July of 1995, and the petitioner is listed on the cover sheet as being six feet, one inch tall and weighing 190 pounds, in no way similar to the description supplied by these ladies.
The state then introduced the written statement provided to the police by the petitioner on March 12, 1993. In the statement, he describes how he was washing his car on March 12, 1993, in front of his aunt's apartment in front of building 5 of the apartment complex when he was accosted by four black males who put guns to his head. They robbed him of his wallet and personal effects and then one of them took his car keys. He described one of the men as having a rifle with a big clip, which he wrestled from him, and when the other *Page 137 
individuals started shooting at him, he returned fire until it stopped. He saw his car pull away and he fired in the direction of everyone.
The state also called as a witness the petitioner's aunt, Ley Zapata, who did in fact live on the third floor of building 5 of the apartment complex on March 12, 1993. She had been taken by detectives that day to police headquarters in handcuffs. It is of significance that she was never even asked by the state if her nephew called up to her in Spanish, whether she threw a weapon out of the window to him or whether she came downstairs and handed him any weapon. In that one of those scenarios appeared to be the state's theory in the case, the court is incredulous as to why she was not asked about these theories. It only leads to the conclusion that they did not think she was involved.
The balance of the state's case was mainly police officers who examined both the scene in the area of building 5 of the apartment complex and the scene some blocks away where Barnes crashed the petitioner's car and ballistics experts who examined shell casings and bullets. Detective Richard Herlihy took into evidence 22 shell casings, caliber 7.62 by 39, from the scene and adjacent to building 5 of the apartment complex. He said he found no other shell casings. His testimony confirmed that caliber could be fired from an AK-47. It should be noted that no AK-47 type weapon was ever found. Herlihy also examined the petitioner's automobile, which contained Barnes' body. Herlihy testified that the car was struck nineteen times by bullets.
The chief medical examiner confirmed that Barnes died as a result of several gun shot wounds. He removed several bullets or bullet fragments from Barnes' body which were turned over to ballistics. The ballistics examiner, Edward Jackimowicz, examined all of the items and could not positively say that the bullets and *Page 138 
bullet fragments he examined were fired from the same gun, nor could he say that any of the bullet jackets removed from Barnes' body were ever a part of the fired cartridge cases retrieved by Herlihy. Jackimowicz described the characteristics of a revolver in that its spent cartridges remain in the chamber and are not ejected.
The defense presented the testimony of the petitioner who basically reported what was contained in his statement previously described, the testimony of Paige, previously described, and the testimony of a Jacob Carattini. Carattini testified he was in the apartment complex on March 12, 1993, visiting his girlfriend and was in the vicinity of buildings 10 and 11 when he saw four individuals approach the petitioner while he was washing his car in front of building 5. One of those individuals was Jenkins. He observed one of them take the petitioner's chain, another was checking his pockets and another got in his car. He described them as armed, one with a revolver and one with some type of rifle. He observed Jenkins strike the petitioner and the petitioner grabbed onto one of the other individuals and began wrestling with him and took the rifle from him. He testified that that was when they started shooting at him and he fired back. Carattini observed the assailants flee, saw the car leave in the direction of the administration building and he then ran when he heard the shots. That was basically the trial.
This court earlier described the original case as not strong. The only real eyewitness to the shooting to support the state's theory of the case that the petitioner went around the building to get a weapon was Jenkins. Both Paige and Carattini have described Jenkins as one of the robbers.
The two witnesses Clayton and Arlington, in describing the male Hispanic who did come around the corner *Page 139 
and get a weapon from a young Hispanic female, have basically eliminated the petitioner as that person based on their descriptions. And further, the testimony of Zapata, the petitioner's aunt, does nothing to bolster the state's case, but in fact weakens it.
At the hearing on the motion for new trial, Attorney Riccio testified under the questioning of an attorney associate in his office. He then presented the testimony of Jefferson, Colon and Ogrinc.
In dealing with the question of due diligence, this court is aware that at the time of the trial the state was not required to provide before trial the names of its witnesses. There is no indication it did so, and the defense, therefore, must cross-examine with little time to prepare, let alone investigate.
In addition, in dealing with the question of due diligence, the court finds that defense counsel exercised due diligence prior to and during the trial. Due diligence means doing everything reasonable, not possible, to discover evidence. Counsel is required to inquire of people who are likely to know of facts. The court finds that he did.
Riccio testified that he was originally hired as private counsel and could not afford the services of an investigator. In its place, both shortly after the shooting and just before the trial, he went personally into three buildings within the apartment complex canvassing for witnesses. There is no question the apartment complex is a violent place, and that is borne out by all the testimony during the trial. Riccio did produce two witnesses, both Paige and Carratini. By the time of trial, Riccio had been appointed a special public defender for the petitioner because of the lack of funds.
Let us then examine the testimony at the hearing beginning with that of Riccio. His testimony is significant for three purposes. First, he testified that on March *Page 140 
12, 1993, when he turned in the petitioner to Lieutenant Mike Koslowski at Bridgeport police headquarters, he was told by Koslowski that the police had witnesses that the petitioner's aunt threw a gun out the window to him. Riccio was not given the names of those witnesses. At no time during any pretrials and up until the trial when the witnesses Clayton and Arlington testified did he learn that the story of the gun being thrown from the third floor window to the petitioner had changed. Second, Riccio testified that he just recently learned that the state's witnesses Jenkins and Staley were well known to each other in March of 1993, in fact lived across the hall from each other in building 4 of the apartment complex, which puts the testimony of Staley that she did not know or see Jenkins on March 12, 1993 in jeopardy. Their relationship could also affect how a jury would evaluate their testimony and version of the events of that day, which are now contradicted by four witnesses, Paige, Carrattini, Colon and Ogrinc. Lastly, Riccio described how Ogrinc came to him in 1997 and how he was contacted by Colon just a short time later.
The petitioner then offered the testimony of an employee of the Bridgeport housing authority, who reviewed the file of Staley as to her living arrangements at the apartment complex. At the time of trial in 1995, Staley gave her address as apartment 105 in building 10. The housing authority employee confirmed that the records indicated that Staley moved to that address in September of 1994. At the time of the incident on March 12, 1993, she lived in apartment 107 in building 4. The significance of this fact is that the apartment is directly across the hall from that of the main state's witness, Jenkins, who gave his address as apartment 104 in building 4. That coupled with the testimony of Riccio that Staley and Jenkins were known to each other might very well have affected a jury and would provide fertile cross-examination in a new trial. *Page 141 
The court specifically finds that the prior nondiscovery of this fact did not arise from any lack of due diligence. Paige, Carattini and now Colon place Jenkins among the robbers of the petitioner. Only Jenkins takes himself out and Staley testified that she did not recognize any of the four persons robbing the petitioner, which indirectly takes him out. As previously stated, the Staley-Jenkins relationship would provide fertile cross-examination that could have substantially affected their credibility.
The petitioner next offered the testimony of Colon, presently an inmate, who lived in building 10 of the apartment complex at the time of the incident. He did not come forward and approach Riccio until some time after this petition was filed in 1997. Riccio had an associate in his office go to the correctional facility to interview Colon. The court again finds that the late discovery of this witness did not arise out of any lack of due diligence.
Colon testified at the hearing that he was on his way back from the store to his residence in building 10 of the apartment complex on March 12, 1993, when he saw the petitioner washing his car. He observed some youths in the area of buildings 6 and 7 and two youths near building 4, including Jenkins, approach the petitioner. He knew that these youths had a reputation for robberies. He testified that the youths from buildings 4 and 6 had guns. He claims he saw the robbery, saw the petitioner wrestling with one of the youths and then heard numerous gunshots, which he believed came from more than one gun. When he heard the shots, he ran into building 10. While watching the robbery, he believes he saw someone on the second floor of building 5 throw some kind of weapon to one of the youths.
Lastly, the petitioner presented the testimony of Ogrinc. She testified that on March 12, 1993, she was *Page 142 
in her kitchen on the second floor of building 5 of the apartment complex when she observed the petitioner washing his car. She knew him by sight but had never talked to him before. She observed four or five youths approach the petitioner, all carrying guns. She observed the petitioner wrestling with one of the perpetrators and take a gun from him. She then heard shots and ducked down. When she got up, the petitioner's car was gone, but he was still there. She further gave her opinion based on information supplied to her by Riccio as to the position of Staley when she observed what she testified about, that Staley could not have seen the area where the petitioner was washing his car and was robbed.
Ogrinc further testified that during the robbery one of the perpetrators saw her in the window and uttered threatening words to her to the effect that she did not see anything. After the incident, she heard again that witnesses better not come forward. She lived at the apartment complex with her two children and was afraid. Three or four years later, she moved out of the apartment complex and then on her own called Riccio in 1997 because "she wanted to do the right thing."
The court again finds that the nondiscovery of this witness did not arise out of any lack of diligence. At the time of trial, she was still living in the apartment complex and the threats had kept her silent. That constituted the evidence at the hearing, all of which the court finds material to the petitioner's case.
Even though some of the newly discovered evidence may be described as cumulative, even that kind of evidence can be a ground for a new trial if it appears reasonably certain that injustice has been done and that the result of new trial will probably be different. Pass v. Pass,152 Conn. 508, 512, 208 A.2d 753 (1965). *Page 143 
In the original trial, only Jenkins and Staley described the petitioner as having gone around the building to get a gun. It is only their testimony that removed Jenkins as a direct participant in the robbery of the petitioner. As already stated, the testimony of Clayton and Arlington does nothing to support the fact that the petitioner was that person. Now with the evidence that Jenkins and Staley were well-known to each other and in fact lived across the hall from each other might well have provided a motivation for them to tailor their stories. No one else supports their version of the events of that day.
The petitioner has always maintained that he wrestled a rifle-like weapon from one of the perpetrators and fired the weapon, which was obviously an automatic weapon, when he was fired upon. That testimony is now supported by two new witnesses, Ogrinc and Colon. In the case of Ogrinc, she appears to have had no motivation to come forward in 1997 other than her own statement that she wanted to do what was right. At the time and as long as she remained a tenant at the apartment complex, she was simply afraid to come forward.
The court finds the testimony at the hearing to be newly discovered and material, not undiscovered by any lack of due diligence, not merely cumulative or only affecting credibility. The court finds that it is reasonably certain that injustice was done in this case and that it is reasonably possible and in fact probable that a different result will occur in a new trial.
The petition for a new trial is granted. *Page 144