EDWARD W. KROONER, JR. *v.* STATE OF CONNECTICUT

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, JS.

 

Argued April 4—decided July 3, 1950

*Reinhart L. Gideon,* public defender, and *Leon A. Bradbury,* for the appellant (plaintiff).

*John S. Murtha,* assistant state's attorney, with whom, on the brief, were *Albert S. Bill,* state's attorney, and *Joseph V. Fay, Jr.,* assistant state's attorney, for the appellee (state).

JENNINGS, J. The plaintiff was convicted of murder in the first degree after a trial to a court of three judges. He sought a new trial on the grounds of newly discovered evidence and the denial of his rights under the federal constitution. A demurrer to the complaint was sustained and judgment was entered for the defendant. The plaintiff appealed.

One of the allegations of the complaint was to the effect that the reception in evidence of the admissions and confessions, written and oral, made by the plaintiff before he was presented before any court or magistrate was forbidden under the federal rule barring evidence obtained in disregard of liberties declared funda-

mental by the constitution of the United States. *McNabb* v. *United States*, 318 U. S. 332, 340, 63 S. Ct. 608, 87 L. Ed. 819. The demurrer attacked this allegation as improper in a petition for a new trial.

The claim that the plaintiff's admissions and confessions were improperly admitted was a proper ground of appeal and, indeed, is one of the most common in criminal cases. General Statutes, § 8013, provides that a new trial may be granted for mispleading, the discovery of new evidence or "for other reasonable cause, according to the usual rules in such cases." The procedure is not intended to reach errors available on appeal of which the party should have been aware at the time when an appeal might have been taken. *State* v. *Brockhaus*, 72 Conn. 109, 111, 43 A. 850; *Andersen* v. *State*, 43 Conn. 514, 516. It is an additional safeguard to prevent injustice in cases where the usual remedy by appeal does not lie or where, if there is an adequate remedy by appeal, the party has been prevented from pursuing it by fraud, mistake or accident. *Dudley* v. *Hull*, 105 Conn. 710, 718, 136 A. 575. "The salutary purpose of the statute is that if a party has a meritorious defense and has been deprived of reasonable opportunity to present it, he ought to be permitted to make it upon another trial." *Bellonio* v. *Thomas Mortgage Co.*, 111 Conn. 103, 105, 149 A. 218. There is no claim that the plaintiff was prevented from taking advantage of the ruling. As a matter of fact, the plaintiff's attorney withdrew his objection to the admission of the confession. The action of the trial court in sustaining the demurrer as to this claim of the plaintiff was correct.

The ruling is somewhat technical and this is a capital case. The record has been examined to determine whether the ruling caused any real injustice to the plaintiff. The killing took place about 2 a. m. The

killer was taken almost red-handed, was brought to the scene of the crime and gave a circumstantial account of his movements during the evening and of the method and motive of the killing. He was then taken to the detective bureau in the Hartford police station where he signed a written confession in substantially the same terms. The time noted on the confession was 5:05 a. m. The only reason for even this short delay was the insistence of the plaintiff that the written statement should be exactly as he wanted it. He has often talked about the crime since that time. He took the stand in his own defense and repeated his statement except that he claimed not to remember the actual stabbing.

The plaintiff cites and relies on the federal case of *McNabb* v. *United States,* supra, and cases of that type. They have no factual similarity to the case at bar. In the *McNabb* case, for example, the accused and his alleged accomplices were arrested between 1 and 2 o'clock Thursday morning and were questioned almost continuously until 2 o'clock Saturday morning under circumstances which amounted to coercion. A similar claim was recently made in the Connecticut case of *State* v. *Buteau,* 136 Conn. 113, 116, 68 A. 2d 681; CCH U.S. Sup. Ct. Bull. Oct. Term, 1949-1950, Docket No. 509. Certiorari was denied. *Buteau* v. *Connecticut,* 339 U. S. 903, 70 S. Ct. 518, 94 L. Ed. 430. The plaintiff suffered no deprivation of due process or of his fundamental constitutional rights.

The allegation of the complaint that another accused, in a different case, was permitted to plead to second degree murder is manifestly irrelevant and vulnerable to the demurrer.

The only remaining claim is that the plaintiff is entitled to a new trial because of newly discovered evidence. Both parties have followed the correct pro-

cedure. The plaintiff filed in court a transcript of the evidence and exhibits received on the former trial together with affidavits summarizing the evidence claimed to be newly discovered.

The course of the state is charted in the often quoted statement in the leading case of *Gannon v. State,* 75 Conn. 576, 578, 54 A. 199: "If the adverse party desires to controvert the accuracy of the statement of the former testimony, or of the new testimony set forth, or to produce other testimony to be considered with that alleged, he may do so, and for this purpose no pleadings are essential. 1 Swift's Digest 788. Or he may admit the accuracy of the statement of the testimony, both old and new, and for this purpose a demurrer is used. In either case, whether upon the testimony old and new—as found by the court after hearing witnesses—or upon such testimony as set forth in the application and admitted, the court decides in the exercise of a sound discretion whether a new trial should be granted or denied." In the case at bar, the state chose to demur to the complaint. The duty of the trial court is thus described in *Kliarsky v. Eastern Greyhound Lines, Inc.,* 116 Conn. 649, 651, 166 A. 65: "Where, as is the usual practice, exhibits attached to the petition set forth the evidence taken upon the trial and that newly-discovered, and the accuracy of both is admitted by demurrer, the court to which the petition is addressed compares the old testimony with the new and decides, in the exercise of a sound discretion, whether injustice has probably been done, and whether the newly-discovered evidence is likely to change the result." The rule on appeal is stated in *Link v. State,* 114 Conn. 102, 157 A. 867, a case since cited with approval. It appears on page 107: "Upon a petition such as this, the plaintiff must assume the burden of proving that the newly-discovered evidence if offered

would probably bring about a different result and in determining this issue upon a hearing of the petition upon its merits, the trial court would exercise a discretion which could be reviewed only if unreasonably, illegally or illogically exercised. *Widman* v. *Kearns,* 96 Conn. 254, 258, 114 Atl. 77. But when the matter is presented, as here, upon a demurrer to the petition, the defendant assumes the burden of showing that the trial court, upon a hearing of the petition, could not in the exercise of a sound discretion grant it."

In accordance with these rules, the trial court compared the evidence offered on the trial with the proposed new evidence and reached the following conclusions: (1) No injustice was done the plaintiff on his trial, and the finding that the plaintiff was guilty as charged was clearly warranted by the evidence there offered; (2) the newly discovered evidence would not, in all probability, bring about a different result; (3) much of the evidence is cumulative, irrelevant or immaterial; (4) the complaint was in effect an appeal for clemency which should be addressed to the board of pardons. Our duty is to determine whether the defendant sustained "the burden of showing that the trial court, upon the hearing of the petition, could not in the exercise of a sound discretion grant it." *Link* v. *State,* supra.

The only defense to the charge was inability on the part of the plaintiff to entertain a specific intent to kill because of drunkenness and because of his mental condition due to his war experience. The killing was admitted. The statement of the evidence offered at the trial will be made with that in mind.

After an uneventful childhood and youth, the plaintiff graduated from high school and soon enlisted in the navy at the age of seventeen. He was transferred to the submarine service and was an able, resourceful

and competent member of the force. After Pearl Harbor, he made twelve submarine missions into enemy waters, took part in many engagements and was subjected to enemy attacks of the most violent nature, both by depth bombing and bombing from the air. On at least one occasion he was hospitalized because of battle fatigue. He had more or less trouble on shore during the war due to drink and overstaying his leave. When the war ended he was stationed in New London. His difficulties during shore leave increased and he was finally sent to jail for three months as a result of one of these incidents. They followed a pattern—drink, sexual intercourse and then beating up the woman. When he returned to his ship after his release from jail, he was examined by a naval medical officer, a psychiatrist, and was found to be sane and competent to stand trial although he had a personality disorder and might be a sexual psychopath. He received an undesirable discharge from the navy and returned to his home. An undesirable discharge is automatic in the navy for a civilian sentence of over thirty days. His mother and sister found him moody at times. His father merely thought he had matured.

After his discharge from the navy, he soon secured employment installing gas appliances. He did his work well and was dependable. On June 15, 1948, he finished his work at 5 p. m. He started drinking at home and continued his drinking in various taverns and bars. By 1 a. m. he had consumed more than half a bottle of whiskey and half a case of ale or beer. None of the bartenders who served him thought he showed signs of intoxication. A man who served him a meal late at night thought he ate as if he had had too much to drink.

About 1 a. m. he decided to seek female companionship. He drove his car to the apartment of Phyllis

Ames on Ashley Street in Hartford. He was slightly acquainted with her. She lived there with her husband and four-year-old child. Her husband worked nights. When he arrived at the apartment he remembered that parking was forbidden on the side of the street on which Mrs. Ames lived, and he drove around to the opposite side of the street to park. He rang the bell of the apartment and Mrs. Ames admitted him. He then had intercourse with her, with her consent, according to his claim, by force, as the state claimed. It is unnecessary to go into the sordid details meticulously recounted by the plaintiff. Thereafter, Mrs. Ames said she was going to tell her husband and became more or less hysterical. He first struck her a severe blow in the eye and, when that did not quiet her, partially throttled her. He then went into the kitchen to get a drink. Mrs. Ames came to and started screaming. He feared what would happen, picked up a paring knife and stabbed her in the back and under her left breast. He knew she would die. He decided to get out of there. Before doing so, he wiped his fingerprints from the knife, the glass, the inside and outside doorknobs and the doorjamb. He was seen leaving the apartment. He got into his car and drove across the Connecticut River bridge. The alarm had been given and he was arrested by officers in East Hartford. When first stopped, he said to the police, "I suppose I'll hang for this."

He was taken first to the East Hartford police station and then to the Ames apartment. The body of the victim was still there. He gave the detailed account summarized above. All of the many officers who questioned him testified that he was sober. He later repeated his story to the coroner and signed the written confession previously referred to. He repeated it again on his trial but then claimed that he remembered nothing from the time he picked up the knife to

the time he found himself standing over the dying Mrs. Ames with the knife in his hand.

Qualified psychiatrists attended much of the trial and interviewed the plaintiff. They also had information from other sources and the war department transcript of his health history while in the service. Dr. Vernlund testified in his behalf as follows: "Q. Doctor, what is your opinion concerning his mental capacity on that evening to form a mental concept of premeditation, deliberation or wilfulness? Meaning by wilfulness specific intent to kill? A. My opinion is that he had no hate in his heart, that there was no intent to kill, and that he had not thought of doing any harm to Mrs. Ames whatever. Q. And is your opinion that he had not the capacity on that evening to do that? A. It is my belief that he had a dim-out for a period and that he was not able to rationalize his acts; it was purely a defense mechanism. His primitive emotion of self protection came into the picture, and he tried to cover up to stop Mrs. Ames from screaming, and it was sort of a scare, tried to scare her to stop screaming."

Dr. Wiedeman testified on the part of the defendant that the plaintiff was not mentally deficient and not mentally deranged. The doctor was informed of the plaintiff's drinking on the night in question and described the effect of alcohol on mental condition. He then testified: "[I]f it [alcoholic condition] were severe enough he might not adhere to the right, even though possibly knowing the right."

The affidavits attached to the complaint set forth the newly discovered evidence. They consist of statements by friends, shipmates and officers giving a more complete description of his war service and expressing the confidence of the affiants that the plaintiff could not have intentionally committed the crime. Two

qualified psychiatrists, who had not testified on the trial, studied these affidavits and had numerous interviews with the plaintiff. As a result of their investigation they are both prepared to testify "(1) That Edward Walter Krooner, Jr., at or about 1:30-2:00 o'clock on the morning of June 16, 1948, was incapable of a wilful, deliberate and premeditated killing. (2) That said Edward Walter Krooner, Jr., at said time and date was unable to adhere to the right."

All three doctors who testified on the trial supported to a greater or less degree the plaintiff's claim that his mental condition at the time he killed Phyllis Ames was not such as to render him legally and morally responsible for his act. As opposed to this, the trial panel had before it the plaintiff and his circumstantial story both of his life in general and of the events of the night in question. In spite of the admitted extensive drinking, only one witness was found who saw signs of intoxication and this was limited to the manner in which he raised his fork to his mouth. The numerous officers who were with him that night testified that he was sober. His stated motive and his actions both before and after the killing, such as parking on the right side of the street and wiping off his fingerprints, were not those of a person rendered irresponsible by drink.

It would serve no useful purpose to cite the numerous cases dealing with new trials. The matter is well summarized in *Gonirenki* v. *American Steel & Wire Co.*, 106 Conn. 1, 137 A. 26, where we said (p. 12): "We will grant a new trial when it appears reasonably certain that an injustice has been done, and that the result of the new trial will probably be different although the evidence supporting the new trial be cumulative. The physical or mental condition of a litigant as testified to by medical experts at one time cannot,

after the case has gone in judgment or award, be again litigated in a motion or petition for a new trial where the same subject-matter was before the court or commissioner and determined in the judgment or award rendered, unless the newly-discovered evidence clearly establish the fact that an injustice has been done and that upon the new trial a different result will probably be reached. In the consideration of every petition or motion for a new trial, a first place should be given by trial judges and commissioners to this general rule: 'There must be an end of litigation, and for that reason the rules governing new trials should be strictly adhered to.' *Widman* v. *Kearns,* 96 Conn. 254, 264, 114 Atl. 77."

In the case of *Andersen* v. *State,* 43 Conn. 514, on which the plaintiff particularly relies, the plaintiff performed no rational acts on the day of the crime, nor was any motive established. A divided court held that, in the interests of justice, the Superior Court should be advised to grant a new trial. The acts and motives of the plaintiff in the case at bar are of a wholly different character.

It is our conclusion that the additional psychiatric opinions of the two new doctors, while based on more complete data, would not overcome the necessary inference from facts admitted by the plaintiff and that the result of a new trial would probably be the same. The trial court's ruling was correct.

There is no error.

In this opinion the other judges concurred.