PETER A. REILLY *v.* STATE OF CONNECTICUT[*]

SUPERIOR COURT          LITCHFIELD COUNTY          FILE NO. 024981

Memorandum filed March 25, 1976

*T. F. Gilroy Daly, Robert M. Hartwell,* and *John Fiore,* for the plaintiff.

*John F. Bianchi,* state's attorney, *Robert E. Beach, Jr.,* office of the chief state's attorney, and *Joseph J. Gallicchio,* special assistant state's attorney, for the state.

SPEZIALE, J.   On September 29, 1973, Peter A. Reilly, the plaintiff in this action, was arrested and charged with the brutal slaying of his mother.   In

---

[*] Given the extensive national and state notoriety of this case, the *State* v. *Anonymous* title which might otherwise have been substituted here, has not been used.

November of 1973, a grand jury indicted him for the crime of murder, charging that "at the town of Canaan, on the 28th day of September, 1973, the said Peter A. Reilly, with intent to cause the death of Barbara Gibbons of Canaan, did cause the death of Barbara Gibbons, by slashing her throat, breaking bones in her body and inflicting stab wounds all in violation of Section 53a-54 of the General Statutes of Connecticut." After a lengthy trial to the jury, on April 12, 1974, the plaintiff was found guilty of the crime of manslaughter in the first degree. On May 24, 1974, he was sentenced by the court (*Speziale, J.*) for a term of not less than six nor more than sixteen years at the Connecticut correctional institution at Somers. In the instant case he has brought a petition for a new trial in three counts pursuant to General Statutes § 52-270 and requests that a new trial be ordered.

The criminal prosecution of the plaintiff arose out of the violent death of his mother, Barbara Gibbons, in Canaan, Connecticut on the evening of Friday, September 28, 1973. On that evening, upon returning home from a teen center meeting, the plaintiff maintains that he discovered his mother on the floor of her bedroom, covered with blood and having difficulty breathing. Subsequent to his alleged discovery, the plaintiff placed several phone calls. He first called the Meyer E. Madow residence. He spoke with Marion Madow and asked that Meyer Madow come to the Gibbons residence with his Canaan ambulance. He then called Dr. Carl Bornemann's house and spoke with Jessica Bornemann. Finally the plaintiff called the Sharon Hospital. The Sharon Hospital notified the state police. Trooper Bruce McCafferty, who arrived at the scene within a few minutes, at 10:02 p.m., testified that the victim had blood on her body and that he was unable to feel a pulse in her left wrist.

The victim was lying on her back with a white "T" undershirt pushed up over her exposed breasts and around her neck, and over the undershirt was an unbuttoned and open blue shirt which partly covered her abdomen. There was no further clothing on her body. Her legs were widely separated exposing her external genitalia. She had been battered and stabbed many times. It was a gory scene, with much blood on the victim's body and in the area surrounding the body. Ernest M. Izumi, deputy state medical examiner, testified that the cause of death was exsanguination of blood due to wounds in the neck and body caused by a sharp object and asphyxiation due to aspiration of blood. Ernest Izumi testified that the autopsy revealed the following injuries concerning Barbara Gibbons: defense stab wound through her right hand, blow to her elbow, blow to her face which broke her nose, a minor brain contusion, at least two slashes of her throat which severed her jugular vein, multiple stab wounds in the lower back, a gash wound in her abdomen, three broken ribs, a deep penetration of her vagina with an unknown object, and two broken femurs.

After the state police arrived on the scene, the plaintiff remained in effective custody. At about 11:10 p.m. Trooper McCafferty obtained a statement from the plaintiff to the effect that when he left the teen center meeting he gave John Sochocki a ride home and then drove straight to his home, arriving there between 9:50 and 9:55 p.m. It was then that he discovered Barbara Gibbons lying on the floor of the bedroom, made several phone calls, moved his car away from the front of the house, and awaited the ambulance.

After the plaintiff gave the statement to Trooper McCafferty, Lieutenant James Shay conducted a strip search of the plaintiff which revealed no blood

on the plaintiff's clothes or body. Lieutenant Shay
then ordered that the plaintiff be transported to
Troop B, North Canaan, and that order was carried
out at about 1:45 a.m. on September 29, 1973.

Lieutenant Shay interrogated the plaintiff at
state police Troop B in North Canaan from about
6 to 8 a.m. The plaintiff was then transported
to Troop H, Hartford, for the purpose of taking
a polygraph test, which he had requested. The poly-
graph test was administered and the interrogation
continued at Troop H over a period of time in excess
of six hours. During the course of that interroga-
tion the plaintiff made certain confessions. He was
then placed under arrest for the crime of murder.

At the original trial, the prosecution relied on
the confessions made by the plaintiff during his
interrogation and on certain other admissions. The
prosecution offered certain medical testimony and
laboratory evidence, including the testimony of
Ernest Izumi, who testified, inter alia, that the
plaintiff could have inflicted all of the injuries on
the victim without being contaminated by her blood.
The prosecution also established that the plaintiff
and his mother sometimes quarreled. The plain-
tiff's apparent lack of grief was developed through
several witnesses. The time sequence of the events
of that evening, from the time the teen center meet-
ing adjourned at approximately 9:15 p.m. until the
time the state police arrived at the Gibbons resi-
dence at 10:02 p.m., was not clearly established.
There was testimony that the phone call placed by
the plaintiff to the Sharon Hospital was received
at approximately 9:40 p.m. and that the state police
received an emergency call regarding Barbara Gib-
bons from the Sharon Hospital at 9:58 p.m.

The defense case in the original trial included the
plaintiff's testimony on his own behalf substantiat-

ing his statement given to Trooper McCafferty at the scene and also the testimony of several witnesses who saw him at the site of the teen center meeting after 9:30 p.m. on that night. Further, the defense introduced the testimony of John Sochocki,[1] then fifteen years of age, who stated that after leaving the site of the meeting at about 9:40 p.m. the plaintiff drove him home and he arrived home at 9:45 p.m. Joanne H. Mulhern testified that Reilly was wearing the same clothes at Troop B as she had seen him wearing the night before at the teen center meeting. Concerning the defense case at the original trial, it is important to note at this point the complete lack of any medical testimony to rebut Ernest Izumi's very damaging evidence, i.e., that the plaintiff could have inflicted all of the injuries on the vicitim without being contaminated by her blood, and also the total absence of any psychiatric testimony to explain the reasons for the plaintiff's confessions to the state police.

Section 52-270 of the General Statutes provides: "The superior court or the court of common pleas may grant a new trial of any cause that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the suit to any defendant or of a reasonable opportunity to appear and defend, when a just defense in whole or part existed, or for other reasonable cause, according to the usual rules in such cases."

This petition for a new trial is in three counts. In the first and third counts, the plaintiff relies on alleged newly discovered evidence as the basis for granting him a new trial. In the second count, the plaintiff alleges that the state failed to provide him with certain exculpatory information and material,

[1] He is now deceased as a result of a drowning accident during the summer of 1975.

including statements, records, tangible evidence, and documents, which he claims deprived him of a trial in accordance with due process of law.

The plaintiff has the burden of proving all the controverted allegations of his complaint. *Link* v. *State,* 114 Conn. 102, 107. The state left the plaintiff to his proof of the allegations of the second count. This court finds that the plaintiff has failed to sustain his burden of proof on the second count of the petition. The plaintiff has not proved that the state withheld exculpatory material from the defense at his original trial. At the trial the defense filed motions for disclosure and production which were answered by the state. At no time during the course of that trial did the defense raise the issue of noncompliance with its motions for disclosure and production. Since the plaintiff has failed to pursue in his brief his claims under the second count, it is apparent that he has abandoned his claims thereunder.

It is clear to the court that prior to and during the trial the state's attorney carried out his duties in accordance with the highest traditions of his office, and that, within the limits of his responsibilities, he made every effort to be fair to the plaintiff.

As to the first and third counts of the petition, the rules for granting a new trial on the basis of newly discovered evidence are well established. "The plaintiff has the burden of proving that the evidence was in fact newly discovered; that it would be material to the issue on a new trial; that it could not have been discovered and produced on the former trial by the exercise of due diligence; that it is not merely cumulative; and that it is likely to produce a different result in a new trial. *Pass* v. *Pass,* 152 Conn. 508, 511; *Taborsky* v. *State,* 142

Conn. 619, 623; *Krooner* v. *State,* 137 Conn. 58, 60; *Hamlin* v. *State,* 48 Conn. 92, 93." *Moynahan* v. *State,* 31 Conn. Sup. 296, 297.

Newly discovered evidence which would be material to the issue at a new trial is any such evidence which goes to the merits of the charge against the plaintiff or helps establish a meritorious defense which was not presented at the original trial.

The due diligence requirement has been interpreted to mean that a new trial will not be granted "if the new evidence relied upon could have been known with reasonable diligence." *White* v. *Avery,* 81 Conn. 325, 328; *Salinardi* v. *State,* 124 Conn. 670, 672. Nevertheless, "[t]he question of due diligence is in all cases to be determined upon consideration of all the circumstances of the case." *Andersen* v. *State,* 43 Conn. 514, 517.

The evidence cannot be "merely cumulative." The modification of the word "cumulative" by the word "merely" must be noted. Merely cumulative evidence would be newly discovered evidence of "the very same fact and the same attending circumstances, testified to upon the former trial, and . . . of the very same nature as that before offered in proof of that same fact." *Hart* v. *Brainerd,* 68 Conn. 50, 54; *Apter* v. *Jordan,* 94 Conn. 139, 141–42. Furthermore, "evidence which brings to light some new and independent truth of a different character, although it tend to prove the same proposition or ground of claim before insisted on, is not cumulative within the true meaning of the rule." *Waller* v. *Graves,* 20 Conn. 305, 311; *Link* v. *State,* 114 Conn. 102, 107–108; *Andersen* v. *State,* supra, 519. Finally, even cumulative evidence can be grounds for a new trial if it "appears reasonably certain that injustice has been done in the judgment rendered and that the result of a new trial will probably be different." *Pass* v. *Pass,* 152 Conn. 508, 512.

In determining whether a new trial should be granted "the primary test is whether an injustice was done and whether it is probable that on a new trial a different result would be reached." *Taborsky* v. *State,* 142 Conn. 619, 623; *Dortch* v. *State,* 142 Conn. 18, 21; *Smith* v. *State,* 141 Conn. 202, 208. "The burden of proving the probability of a different result is upon the plaintiff, and in determining that issue the trial court exercises a discretion which cannot be reviewed unless its discretionary power has been abused." *Taborsky* v. *State,* supra; *State* v. *Goldberger,* 118 Conn. 444, 457.

The function of a court at a hearing for a new trial is to determine whether the evidence presented at the hearing considered with the evidence presented at the original trial warrants the granting of a new trial. That determination is within the sound discretion of the court. *Pass* v. *Pass,* supra, 510; *Krooner* v. *State,* 137 Conn. 58, 62; *Gannon* v. *State,* 75 Conn. 576, 578–79. This court is in an advantageous position to determine whether the plaintiff has sustained his burden of proof. By virtue of having presided at the plaintiff's original trial, this court is able to consider more than merely a cold printed record of the former proceeding. In fact, this court is able to rely on its personal observation of the witnesses and their demeanor and conduct in the courtroom and on the witness stand, their testimony, and the voluminous record of that proceeding, of which the court has taken judicial notice. Consequently, the court, in the exercise of its discretion, has drawn upon its extensive knowledge of the plaintiff's case in reaching this decision.

After a long and deliberate study of all of the transcripts of the original trial and the instant proceeding, together with the pleadings and exhibits

in both cases, this court concludes that an injustice has been done and that the result of a new trial would probably be different.

The evidence presented by the plaintiff at this hearing appears to the court to have been offered for four purposes. These are: (1) to establish the existence of a potential suspect or suspects other than the plaintiff; (2) to establish a precise time sequence of the events of the evening of September 28, 1973; (3) to refute and explain the validity of the plaintiff's confessions and admissions; and (4) to refute the testimony of Ernest Izumi. The unusual and bizarre nature of the facts and circumstances of this case has been kept in mind in the consideration of this petition for a new trial.

## I

At this hearing the plaintiff brought out, through Sergeant Gerald F. Pennington of the state police, that a previously unidentified fingerprint found at the murder scene had been identified as of January, 1976, while this hearing was in progress, as that of Timothy A. Parmalee. That fingerprint had been found on the back screen door of the Gibbons residence and was described at the original trial as an identifiable but unidentified fingerprint. During the course of this hearing the state conceded that the fingerprint is that of Timothy Parmalee and that it is, indeed, newly discovered since there was no way to identify it before or during the plaintiff's trial. The court ruled at that time that the identified fingerprint is newly discovered evidence and was not discoverable during or prior to the original trial by the exercise of due diligence.

In connection with the newly discovered fingerprint this court has considered the testimony of Sandra Ashner. Both her testimony and the identification of the fingerprint raise the issue of the

possibility of a new suspect or suspects in the killing of Barbara Gibbons. More specifically, that evidence focuses on Timothy Parmalee and his brother Michael as possible suspects.

Sandra Ashner testified at this hearing that on the night of September 28, 1973, Michael C. Parmalee departed from the trailer where they were living, that he did not sleep with her that night, and that he was not present the next morning when she woke up at approximately 7:30 a.m. She also testified that Michael Parmalee did not return to the trailer until 8:30 or 9 a.m. and that, thereafter, he was unable to sleep at night because he was upset, shaking, and nervous. As a result of his unusual behavior Ashner moved out. That testimony amounted to a retraction of an unsworn statement given by Ashner to the state police on October 7, 1973, during the course of their investigation of the Gibbons death. In that statement Ashner had supported Michael Parmalee's alibi for the night of September 28, 1973, by stating that he had spent the entire night with her in the trailer, which was located within walking distance of the Gibbons residence.

Sandra Ashner did not testify at the original trial, and neither the plaintiff nor his counsel was aware of the existence of her statement concerning Michael Parmalee at the time of that trial. It was not until April of 1975 that Ashner indicated that her statement of October 7, 1973, was false. She testified at this hearing that she had lied to the state police because she had a little child and did not want to get involved. Her testimony is newly discovered evidence and was not discoverable by due diligence during or prior to the original trial. The facts withheld by Ashner could not have been discovered with due diligence since the plaintiff did not know at the time of that trial of her statement to the police

of October 7, 1973. The Ashner retraction in April, 1975, introduced for the first time a suspect other than the plaintiff, thereby opening an avenue of investigation which was not available to the defense at the original trial, namely, the possible involvement of Michael Parmalee in the death of Barbara Gibbons. The issue of Michael Parmalee's possible involvement is newly discovered evidence since it was not apparent until April of 1975 when Ashner retracted her statement of October 7, 1973.

Michael Parmalee's possible involvement and the identification of the unidentified fingerprint as that of Timothy Parmalee, Michael's brother, raise the issue of the possibility of a new, legitimate suspect or suspects in the death of Barbara Gibbons. That issue is clearly material and relevant to the plaintiff's defense on a new trial. The interjection of a new fingerprint and a suspect or suspects other than the plaintiff is not in any way cumulative. That evidence is of a completely different character from that offered at the plaintiff's original trial.

It is obvious that newly discovered evidence can logically and reasonably lead to other evidence, not necessarily new, which would then take on new dimensions and importance. Therefore, any relevant and material evidence which logically and reasonably flows from the Ashner retraction and the identification of the fingerprint which establish the possibility of a new suspect or suspects must be taken into consideration by this court. That would include the evidence which was presented at this hearing in an attempt to establish motives on the part of Michael Parmalee and Timothy Parmalee, i.e., the animosity between the victim and Michael Parmalee, the possible robbery of the victim by Timothy Parmalee, and the fact that both of them had not been allowed in the Gibbons house since the spring of 1973. Neither the identity of the finger-

print nor the existence of motives on the part of Michael and Timothy Parmalee would have been discovered but for Ashner's retraction.

As to the Ashner retraction and the newly identified fingerprint, the state has argued that a different result would not be likely at a new trial. The state asserts that Ashner is not a credible witness. Her credibility, however, is not for this court to determine. Concerning the issue of credibility, this court must decide only whether there is a "reasonable certainty that the evidence will be admitted at the new trial [and] also a reasonable probability that the jury will accept it." *Smith* v. *State*, 141 Conn. 202, 216 (opinion of *O'Sullivan, J.*, dissenting). It is up to the jury at the new trial to weigh Ashner's credibility.

The state has also argued that the fingerprint was more valuable to the plaintiff's defense when it was identifiable but unidentified. At the trial the defense brought out the unidentified fingerprint and attempted to show that the motive for the killing was robbery and that the killer left by the back door, which was found partly open, leaving his fingerprint on the rear screen door. The state's argument that the "mystery killer" theory provided the plaintiff with a better defense than one based on the identified fingerprint is not persuasive. The point that real live people make better suspects than fictitious or unidentified persons does not have to be belabored. It is extremely significant that the fingerprint has been identified as that of Timothy Parmalee, Michael Parmalee's brother.

At the plaintiff's trial all of the fingerprints found at the scene of the crime, except the identifiable but unidentified fingerprint on the rear screen door, were identified as those of the plaintiff, the victim, and others who had admittedly been at the scene

on the night of the crime or the following day. There was also an identifiable but unidentified partial palm print found on the front screen door, which remains unidentified. At this hearing, Sergeant Pennington testified that it is reasonably possible that Timothy Parmalee's print was left on the rear screen door on the night of September 28, 1973. He also testified that it is reasonably probable that the hand of Timothy Parmalee made certain other marks on that door. Those were a smudged area to the right of the identified Parmalee fingerprint and some partial ridge structures, not identifiable, to the left of the identified fingerprint. The jury on a new trial could very well accept and give credence to a theory that the fingerprint was left by Timothy Parmalee on the night of Barbara Gibbons' death.

This court must not lose sight of the fact that to convict Peter A. Reilly the jury had to believe and find that he was guilty beyond a reasonable doubt. The unusual circumstances of this complicated and bizarre case explain why the jury at the original trial must have had great difficulty in arriving at their verdict. It was only after two days with more than fifteen hours of deliberation, after large segments of the testimony were read back to them, and after the court supplementally charged them with a modified version of the "Chip Smith" charge;[2] *State* v. *Smith*, 49 Conn. 376, 386; that the jury returned a guilty verdict.

---

[2] On April 12, 1974, at 2:39 p.m., the court summoned the jury and addressed them as follows:

"All right, ladies and gentlemen, you have been deliberating for some time in this case, and I want to address you briefly at this time.

"I kept all of you here until about 10:40 p.m. last evening, and it is now about nineteen minutes to 3:00 [p.m.]; and, first of all, let me assure you, ladies and gentlemen, that I have no criticism to make of the length of time that you have been in conference. In fact, it indicates the earnestness with which you are considering the

The court believes that an injustice was done in that Peter A. Reilly was convicted without having the benefit at his original trial of exploring and fully presenting the avenue of defense raised by the Ashner retraction and the identification of the fingerprint. In this court's view, there is a reasonable certainty that this evidence would be admitted at a new trial and it is reasonably probable that on a new trial the jury would reach a different result. *Smith* v. *State,* 141 Conn. 202, 208; *Salinardi* v. *State,* 124 Conn. 670, 672.

## II

At the plaintiff's original trial, the state's first witness was Barbara G. Fenn, the night supervisor, who was on duty on the evening in question at the Sharon Hospital emergency room. She testified that she spoke with the plaintiff about Barbara Gibbons' condition at approximately 9:40 p.m. The defense did not establish a different time sequence for the evening of September 28. In fact, the testimony of Marion Madow, one of the main defense witnesses, confirmed Barbara Fenn's testimony as to the approximate 9:40 p.m. time. Marion Madow testified at the original trial that she received the plaintiff's call during a certain scene in the movie

matter. However, I feel it is my duty to give you ladies and gentlemen whatever aid I can in assisting you in arriving at a verdict, if you are having a problem.

"Although the verdict to which each juror agrees must, of course, be his own conclusion and not a mere acquiescence in the conclusions of his fellows, and although each juror has the right and duty to retain his own opinion, yet, in order to bring twelve minds to a unanimous result, each juror should examine with candor the questions submitted to them with due regard and deference to the opinions of each other, bearing in mind that the other jurors have heard the same evidence with the same attention and with equal desire to arrive at the truth, and under the sanction of the same oath.

"I want you to bear that in mind, ladies and gentlemen, and I am going to ask you to return to the jury room."

The jury then retired at 2:43 p.m., and reached a unanimous decision at 3:09 p.m.

"Kelley's Heroes" which she had been viewing on television. The only other times which were established at the trial were the 9:58 p.m. call to the state police and the arrival of the police at the scene at 10:02 p.m.

The state contended at the original trial that the plaintiff had the opportunity to commit the crime, as well as to wash, change out of his clothes and into a fresh set of clothing, and then dispose of the blood-stained clothing down the road from the Gibbons residence between the time he arrived home from the teen center meeting and the time the state police arrived at the scene at 10:02 p.m. In order to convict the plaintiff, the jury had to believe beyond a reasonable doubt that the plaintiff had sufficient time to perform those acts. Time was a key factor, essential to the commission of the crime.

It was affirmatively established at this hearing, through the testimony of Michael Marden, director of prime time feature films for CBS Television, that the scene Marion Madow described at both the trial and this hearing was transmitted at 9:50:10 p.m. (nine hours, fifty minutes, and ten seconds p.m.). He also testified that it could not have been shown by the local television station any earlier than 9:50:10 p.m. Therefore, the plaintiff could not have telephoned Marion Madow before that time. The fixing of the exact time of the plaintiff's telephone call to the Madow residence is newly discovered evidence; and this court finds that under the circumstances the failure to discover that fact at the original trial cannot be ascribed to any lack of due diligence of the plaintiff. At the original trial, Marion Madow testified that the plaintiff called between 9:40 and 9:50 p.m. Since her testimony was consistent with Barbara Fenn's testimony that she

spoke with the plaintiff at approximately 9:40 p.m., there would have been no reason for defense counsel, in the diligent preparation of the plaintiff's case, to investigate that issue further. Although theoretically discoverable prior to or during the plaintiff's original trial, the discovery of the actual broadcast time of a specifically identified scene in a television program goes beyond the scope of reasonable due diligence, particularly since the plaintiff knew that Barbara Fenn and Marion Madow agreed on the time of the call. Furthermore, that newly discovered fact is not merely cumulative within the rule established by the cases. *Pass* v. *Pass,* 152 Conn. 508, 512; *Apter* v. *Jordan,* 94 Conn. 139, 142–43. It is a distinct fact which raised the possibility of a completely new time sequence for the events of the evening of September 28, 1973. As such it is material to the issue on a new trial because time was of the essence as to the plaintiff's ability to commit the crime.

As a result of the discovery of the exact time of the call to the Madow residence, the plaintiff made further inquiry regarding the time sequence of the events of the evening of September 28, 1973. A significant portion of the testimony presented at this hearing was introduced to establish a more precise time sequence. Dr. Frank Lovallo testified that the victim called him that very evening between 9:20 and 9:40 p.m., establishing that she was alive after the plaintiff's arrival at the teen center meeting. The Reverend Peter L. Dakers, Father Paul Halovatch, and others testified about the time when the plaintiff departed the church building where the teen center meeting was held. Their testimony places the plaintiff's departure between 9:40 and 9:45 p.m. Judy MacNeil, John Sochocki's aunt, testified that Sochocki, whom the plaintiff had driven home, had entered the house at 9:45 p.m. and

that she heard a car outside the house immediately prior to that time. Trooper James T. Mulhern testified at this hearing that he and Lieutenant Shay had timed the drive from a point near John Sochocki's house to the victim's house and that it would take at least five minutes and twenty-nine seconds. Jessica Bornemann, who received the plaintiff's second phone call after the 9:50:10 p.m. call to the Madows, testified that she spoke with the plaintiff for two or three minutes. The Bornemann call had to have been placed after the call to the Madows since the plaintiff told Jessica Bornemann that he had already telephoned for an ambulance. The third call was to the Sharon Hospital and was received by two individuals, one of whom, Barbara Fenn, spoke at some length with the plaintiff. Evidence was introduced to establish that Barbara Fenn's recollection that she spoke to the plaintiff at appproximately 9:40 p.m. had to be incorrect, and Barbara Fenn admitted on cross-examination that the call could have been received later. Elizabeth Swart, the switchboard operator at the Sharon Hospital who took the incoming call from the plaintiff, logged the call in at approximately 10 p.m. Furthermore, Paul W. Sternlof, the supervisor at the Sharon Hospital, testified that it would not be appropriate for a supervisory nurse, such as Barbara Fenn, to receive an emergency call at 9:40 p.m. and not to notify the state police until 9:58 p.m. unless such delay could be justified by a major problem in the hospital. Sternlof also testified that no incident of that magnitude occurred in the Sharon Hospital on the night of September 28, 1973.

The plaintiff argues that that evidence when viewed in the light of Michael Marden's testimony is newly discovered and material to the issue of whether he had sufficient time to commit the alleged

crime and other acts. He asserts that a different time sequence could raise a reasonable doubt in the minds of the jurors on a new trial which would produce a different result.

The new time sequence relied upon by the plaintiff places his arrival home at approximately 9:50 p.m. At the original trial, the plaintiff's arrival home was indicated to be approximately 9:40 p.m. It is reasonably certain that a jury would accept the new time sequence evidence. In addition to Michael Marden's testimony placing the call to the Madows no earlier than 9:50:10 p.m., the other evidence independently supports a factual conclusion that the plaintiff arrived home at approximately 9:50 p.m. The testimony established that the plaintiff left the church building with John Sochocki at approximately 9:40 to 9:45 p.m. and that Sochocki arrived home at 9:45 p.m. The trip from near Sochocki's home to the Gibbons home, according to state police testimony, took approximately five minutes and twenty-nine seconds. The jury could reasonably infer, therefore, that the plaintiff arrived home at approximately 9:50 p.m. After the plaintiff telephoned the Madow residence, which took about a minute, he phoned the Bornemann residence in order to speak with Carl Bornemann. Jessica Bornemann testified that she spoke to the plaintiff for two or three minutes. From this, the jury could reasonably infer that the plaintiff placed his call to the Sharon Hospital at approximately 9:53 to 9:54 p.m. During that call the plaintiff spoke with both Elizabeth Swart and Barbara Fenn, and he spoke with Barbara Fenn at some length. If the phone call lasted several minutes, which can be reasonably inferred from the testimony, then the 9:58 p.m. phone call to the state police was placed almost immediately after the plaintiff's call to the hospital was completed.

The witnesses who testified at this hearing regarding a new time sequence were available to testify at the original trial. Some, in fact, did testify at that trial. Nevertheless, the testimony of those various witnesses relating to the sequence of events on the night of the crime is either at variance with their original testimony or suggests that some witnesses were mistaken in their testimony. It cannot be said that the failure to establish an exact time sequence through those witnesses at the original trial amounted to a lack of due diligence on the plaintiff's part. The evidence introduced which tends to establish a new and more precise time sequence is similar to the evidence which was only discoverable as a result of the Ashner retraction and the identification of the fingerprint. The establishment of the exact time of the television sequence testified to by Marion Madow, which this court finds was not discoverable by due diligence, opened an avenue of investigation which was not apparent at the original trial. A new time sequence is not only material but crucial to the issue of whether the plaintiff committed the crime. An injustice was done the plaintiff since he was convicted without an opportunity to frame a defense based on the new time sequence evidence.

Although the testimony of the witnesses other than Michael Marden may be somewhat cumulative, and although some of the time sequence evidence was introduced for the purpose of impeaching the credibility of Barbara Fenn, it appears reasonably certain to this court that that evidence together with the testimony of Michael Marden would raise a reasonable doubt in the minds of a jury that the plaintiff had committed the crime and is therefore likely to produce a different result upon a new trial. When it appears that an injustice has been done in the judgment rendered and that the result of a new

trial will probably be different, the prohibitions against granting a new trial on the basis of cumulative or impeaching evidence are not applicable. *Pass* v. *Pass,* 152 Conn. 508, 512; *Krooner* v. *State,* 137 Conn. 58, 67; *Gonirenki* v. *American Steel & Wire Co.,* 106 Conn. 1, 12; *Apter* v. *Jordan,* 94 Conn. 139, 142–43; *Husted* v. *Mead,* 58 Conn. 55, 61.

### III

After the state presented its evidence at this hearing, it requested the court to take judicial notice of the entire record of the plaintiff's original trial and the court did so. At that point the plaintiff requested that he be allowed to offer the testimony of Herbert Spiegel, a psychiatrist, to refute the validity of the plaintiff's confessions and admissions which were part of the record of the former proceeding. The court overruled the state's objections and allowed Spiegel to testify.

This court was highly impressed by Spiegel's credentials[3] and his testimony, as well as his demeanor, candor, and frankness on the stand, and his ability to comprehend and answer questions clearly and

[3] Herbert Spiegel is an associate clinical professor of psychiatry at the Columbia University College of Physicians and Surgeons. He is also associated with Presbyterian Hospital at Columbia as well as St. Luke's Hospital in New York City. In 1946, Spiegel was certified by examination by the American Board of Psychiatry. He did his undergraduate studies at the University of Maryland and then attended the University of Maryland Medical School. Spiegel trained in general medicine at St. Francis Hospital at the University of Pittsburgh and studied psychiatry at St. Elizabeth's Hospital in Washington, D.C. He had his training in psychoanalysis at the William Allenson White Institute in New York. Spiegel has engaged in the private practice of psychiatry since 1940. He has taught and lectured at numerous medical schools including the University of Chicago, Emory University, Cornell, New York University, Harvard, Yale, the University of Pennsylvania, Stanford University, and the University of Rome. He has also guest lectured at a course at New York University Law School which deals with the quality of confessions obtained by police interrogation and the psychological factors that have to be taken into account when evaluating such confessions.

unequivocally. To analyze the plaintiff's confessions and admissions, Spiegel employed a new profile test that measures the ability of people to concentrate under given test conditions. Although that test had been in development over a period of eight years, it was first accepted in the medical community after the publication of an article by Professor Ernest Hilgard in the February, 1975, issue of Annals of Psychology. Spiegel was personally involved in the development of that test as principal investigator. On the basis of the profile test, Spiegel concluded that the plaintiff's confessions and admissions were obtained by either coercion or deception, given the plaintiff's personality and his susceptibility to influence by persons in positions of authority. In his testimony, Spiegel characterized the plaintiff as "a somewhat immature young man who has a serious deficit in his ability to identify who he is as a person. . . . As a result of this, he had difficulty in integrating his concept of self, and, at the same time, has confusion and difficulty and a poor ability to integrate his conceptions of others; and this combination of being so terribly uncertain about who he is as a person and who he is relating to, especially people in authority, leads to a great deal of confusion and, certainly, a great deal of difficulty in trying to withstand any efforts at interrogation and to make critical judgments about the difference between a statement and an assertion or a question . . . . [H]e can easily be confused; and he most certainly can easily accept as a fact something that he knows nothing about."

Although the plaintiff concedes that psychiatric testimony was available to him at his original trial, he argues that since the new scientific method utilized by Spiegel was unavailable to him at that time, the testimony of Spiegel is newly discovered evidence. The plaintiff's argument is persuasive. Fur-

thermore, since the method of analysis was not available at the time of the plaintiff's trial, no amount of due diligence could have discovered it.

The state argues that psychiatric testimony was available to the plaintiff at and prior to the trial, that Spiegel's testimony is merely cumulative to the argument made to the jury by the plaintiff's defense counsel, and that the testimony is not likely to produce a different result upon a new trial. In support of its argument, the state relies on *Krooner* v. *State,* 137 Conn. 58, 68, in which the court held that the psychiatric opinions of two doctors based on more complete data than were available at the original trial were merely cumulative and would not be likely to produce a different result upon a new trial. The instant case differs in a significant aspect from *Krooner,* in that in *Krooner* there was psychiatric testimony at the original trial, while at the plaintiff's trial there was no psychiatric testimony. It may have been a lack of due diligence not to have had any psychiatric testimony at the original trial. See Part IV, infra. Even if there had been such testimony, however, there could not have been any analysis based upon the test utilized by Spiegel since it was not accepted by the medical community until after the plaintiff's trial. Here, the newly discovered evidence presented by Spiegel is clearly not cumulative since the issue of the plaintiff's mental state when he made the confessions and admissions was not raised at his original trial. The defense counsel's rhetoric in argument to the jury is obviously not evidence, has no probative value, and, therefore, is not testimony which may fall within the proscription of the rule against cumulative evidence.

Spiegel's testimony is relevant and material to the nature, weight, and admissibility of the plaintiff's confessions and admissions. Those were a

critical part of the state's case against the plaintiff. Certainly the state's reliance on the confessions and admissions was valid and this court has found no impropriety on the part of the state police in obtaining them during the extended interrogation. The confessions were ruled legally valid by two judges prior to their admission at the plaintiff's original trial.[4] The state police were engaged in investigating a brutal and violent slaying. They were justified in considering the plaintiff as a suspect and questioning him at length because of many factors, including his uncertainty, his vacillation, his claim that his mother was breathing when he arrived home and other behavior, such as his request for a polygraph test.

Nevertheless, this court believes that an injustice was done the plaintiff at his original trial because of the absence of any expert testimony to raise the issue of the reliability of the plaintiff's confessions and admissions. The confessions and admissions went totally unexplained except in the testimony of the plaintiff himself. Since the confessions and admissions were an important element of the state's case against the plaintiff, it is reasonably probable that a jury would accept Spiegel's testimony and that such testimony would probably lead to a different result upon a new trial.

## IV

At a hearing on a petition for a new trial based on newly discovered evidence, it is important for the court to "determine whether the new evidence is such that it is likely to reverse the result, so that, for lack of it, [at the original trial] an injustice has probably been done." *Salinardi* v. *State,* 124 Conn. 670, 672; *Gannon* v. *State,* 75

---

[4] A pretrial defense motion to suppress the confessions was denied by Superior Court Judge Anthony J. Armentano on February 12, 1974, and this court later ruled them admissible at the original trial.

Conn. 576, 578. The Supreme Court of this state has held that in certain cases involving newly discovered evidence there may be a less rigid application of the rules for granting a new trial. *Taborsky* v. *State,* 142 Conn. 619; *Andersen* v. *State,* 43 Conn. 514. In *Taborsky* and *Andersen,* the plaintiffs petitioning for new trials had been convicted of murder in the first degree, a capital offense. The newly discovered evidence presented in those cases was of such a character as to raise a doubt in the court's mind that the convictions would stand upon a new trial. As a result, in each case the court relaxed the requirement that the evidence must be such that it could not have been discovered by due diligence at the time of or prior to the original trial and granted new trials to the plaintiffs. In both *Taborsky* and *Andersen* the court expressed its concern that a human life was at stake.

In this court's opinion, an underlying principle of *Taborsky* and *Andersen* is that in certain serious criminal cases, if it appears to the court that evidence which is adduced at the hearing on the petition for a new trial could have a persuasive impact on a jury and might well be " 'sufficient to turn the cause in favor of the applicant' "; *Apter* v. *Jordan,* 94 Conn. 139, 141, 108 A. 548, quoting from 1 Swift, Digest, p. 786; *Taborsky* v. *State,* supra, 631; an injustice would be done to the plaintiff if a new trial is not granted, even if all the traditional criteria for granting a new trial on the basis of newly discovered evidence are not satisfied. In such cases the court should grant a new trial when it is apparent that a grave injustice has been done and that the result at a new trial would probably be different.

In considering the failure to exercise due diligence in the discovery of only part of the newly discovered evidence, application of the principle of *Taborsky* and *Andersen* is particularly appro-

priate in this case. The plaintiff was eighteen years old when he was accused of the crime of murdering his mother. He had no previous criminal record. He was indicted and prosecuted for the crime of murder, the most serious crime in this state. His conviction is likely to have a serious and lasting impact on the rest of his adult life.

The plaintiff's youthfulness, immaturity, and inexperience may have made it difficult for him properly to assist in the investigation of this case and the preparation of his defense. Therefore, certain aspects of his defense that may have been properly developed through the exercise of due diligence may have been overlooked or their importance unappreciated by the plaintiff and his counsel at the original trial. See *Andersen* v. *State,* supra, 518. The court must note, however, that the defense's failure to present any psychiatric testimony to explain and refute the plaintiff's confessions and admissions, although a favorable psychological report was available to it, and also its failure to offer any medical testimony to rebut the very damaging testimony of Ernest Izumi clearly demonstrate a lack of due diligence. Those two serious omissions created gaps in the defense and it is likely that the plaintiff was unable to perceive those gaps because of his immaturity and inexperience.

Those omissions have been rectified upon this hearing for a new trial by the testimony of Drs. Herbert Spiegel and Milton Helpern. The importance of Spiegel's testimony to refute the plaintiff's confessions and admissions has already been discussed. See Part III, supra. This court has ruled that Spiegel's testimony satisfied the criteria for a new trial on the basis of newly discovered evidence because the profile test upon which Spiegel based his analysis of the plaintiff's confessions and admissions was not accepted in the medical community

until after the plaintiff's trial. Nevertheless, the defense could have called expert witnesses at the original trial to testify about the plaintiff's personality. Moreover, at this hearing it was established that the plaintiff had been interviewed and tested by a clinical psychologist during the original trial. Certainly, the testimony of that psychologist, as well as the testimony of a psychiatrist or psychiatrists who could have interviewed the plaintiff, should have been presented at the plaintiff's original trial. That is borne out by Spiegel's testimony that he reviewed the psychologist's report after he had reached a diagnosis of the plaintiff's personality and that the report confirmed and in no way altered his judgment.

Milton Helpern,[5] a nationally known expert in the field of forensic medicine, testified on behalf of the plaintiff. He was called primarily to refute the testimony of Ernest Izumi at the original trial. In response to certain hypothetical questions posed by the plaintiff, Helpern testified that it would have been physically impossible for the plaintiff to have committed the crime, either under the original time sequence or the time sequence established by the newly discovered evidence, without being contaminated by the victim's blood.[6] The strip search of

[5] Milton Helpern is emeritus professor of forensic medicine at New York University School of Medicine, retired chief medical examiner of New York City, emeritus professor of pathology at Cornell University Medical College, and is certified in anatomic pathology and forensic pathology by the American Board of Pathology.

[6] Helpern's opinion was that "it is not possible to say with any degree of precision how long it would take to inflict these injuries; but, again, in view of the location of the body at the scene and nature of the multiple injuries, both blunt force, stabbing and cutting on both sides of the body, including the head and extremities, front and back and genitalia, it is reasonable to conclude that the infliction of such injuries would contaminate the assailant and his clothing with blood, especially since the body would have to be turned over. One would reasonably expect that such injuries would contaminate the assailant and his clothing which would be readily evident, if he was examined after he was taken into custody."

the plaintiff did not reveal any blood on the plaintiff or his clothing, nor was there any evidence of blood in the drains of the house or in the septic tank system. Helpern's testimony controverts that of Izumi at the plaintiff's trial that it was possible for the plaintiff to have committed the crime without being contaminated by the victim's blood. Izumi's testimony at the original trial was damaging to the plaintiff's case and could have materially contributed to the plaintiff's conviction. In fact, the jury, in the course of its deliberations, requested that certain portions of Izumi's testimony be read back to it. The absence of any evidence to controvert Izumi's testimony at the original trial was a serious omission on the part of the defense. Helpern's testimony is clearly material to the issue of whether the plaintiff committed the crime.

Helpern's testimony is also not merely cumulative within the meaning of the rule because it is of a materially different character than the testimony of Izumi. Finally, although a new trial will ordinarily not be granted on the basis of discrediting or impeaching testimony; *Smith* v. *State,* 139 Conn. 249, 251; that "prohibition is not applicable, where, as here, the impeaching testimony is of such importance that it appears reasonably certain that an injustice has been done and that the result of a new trial would probably be different. *Husted* v. *Mead,* [58 Conn. 55], 64; *Apter* v. *Jordan,* [94 Conn. 139], 143." *Taborsky* v. *State,* 142 Conn. 619, 632.

After reviewing the testimony of Helpern and Spiegel, the court is convinced that an injustice was done Peter A. Reilly because he was convicted without having the benefit of that type of testimony at his original trial. Although there was a lack of due diligence in obtaining that type of testimony, the seriousness of the charges against the plaintiff and this court's finding that an injustice has been

done to the plaintiff necessitate a relaxation of the rigid rules in considering the failure to exercise due diligence in the discovery of only part of the newly discovered evidence.

"A new trial will not be denied the plaintiff because of his failure to exercise due diligence in the discovery of only part of the newly discovered evidence, when the remainder, which he could not possibly have discovered, is of such great moment." *Taborsky* v. *State,* supra, 632–33. The testimony of Helpern and Spiegel as well as the other evidence, which this court has determined does satisfy the traditional criteria for granting a new trial on the basis of newly discovered evidence, is reasonably certain to be admitted into evidence upon a new trial and is reasonably likely to produce a different result upon that trial.

In conclusion, this court is mindful of the unusual, bizarre, and complicated nature of the facts and circumstances of this case. The proceedings before this court, both at the original trial and at this hearing, have been long, arduous, and complex. This court has virtually lived with all of the many and varied aspects of this case for over two years, and is very much aware of its grave responsibility to exercise cautiously the awesome power of the court to grant or deny this petition for a new trial. It is well established that sound public policy requires that all litigation come to an end at some point, and in that connection our Connecticut Supreme Court has said "that the maxim 'interest reipublicae ut sit finis litium' is one of the 'embodiments of wisdom and justice.'"[7] The weight and significance of that consideration, however, pale quickly and it must give way when a court determines that an injustice has been done. Our statute which provides the remedy of a new trial is designed to correct serious

[7] See *Stocking* v. *Ives,* 156 Conn. 70, 73, and cases cited therein.

miscarriages of justice. This court concludes that the purpose of that statute would be thwarted if the conviction of Peter A. Reilly were allowed to stand. For the reasons previously set forth in this opinion, it is readily apparent that a grave injustice has been done and that upon a new trial it is more than likely that a different result will be reached.

The plaintiff has sustained his burden of proof on the first and third counts of his petition.

Accordingly, the petition for a new trial is granted and a new trial is hereby ordered.