[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Trial of the above entitled case arises from suit by the plaintiff (Gaynor), a Connecticut corporation which manufactures electro-magnetic switches, against the defendant James Hollander, sole proprietor of a New Hampshire company known as Hot Grips Manufacturing, which produces heated handle bar grips for snowmobiles. The parties began doing business with one another in 1986 when the plaintiff agreed to supply the defendant during 1987 with a large quantity of switches which the defendant ordered and agreed to pay for at a specified price. The switches were incorporated in the grips which Hollander marketed.
The relationship of the parties was mutually satisfactory during 1987, and new agreements were reached for the additional manufacture and supply of switches to the defendant in 1988 and again in 1989.
In July 1989, the defendant discovered the presence of a jamming problem which rendered a quantity of switches sold by the plaintiff defective and unusable. Upon notification thereof the plaintiff's president and principal owner, Adrien Heche, personally and expeditiously visited the defendant's plant to investigate the problem. It was determined that jamming was due to bending of a plunger, one of the components of the switch. Despite the plaintiff's efforts to ascertain through outside laboratory analysis the specific reason for the bending, no definitive conclusion was reached, and causation remains somewhat speculative.
Within a very short period of time following notification of the problem, the plaintiff requested return by the defendant of all of the switches which were included in the defendant's inventory. During the period August through November, the defendant shipped and the plaintiff received some 29,000 switches.
To accommodate its customer's pressing need Gaynor supplied Hollander during July and August with about 6,000 switches which were of premium quality and higher priced than those switches called for by the 1989 contract. No additional charge was assessed for the premium switch, and Gaynor filled the balance of Hollander's order by repairing or replacing the switches which had been returned and for which Hollander had been given full credit.
Although the parties continued to do business during the latter part of 1989 and early 1990, the defendant refused to pay for additional and earlier replaced switches, and the plaintiff was compelled to bring suit for recovery of the indebtedness. Just prior to the start of trial the parties stipulated that judgment was to enter in favor of the plaintiff on its complaint against the defendant for damages of $17,900.58. The judgment debt includes interest on the outstanding indebtedness through the CT Page 10186 period November 7, 1991.
The issues before the court are those raised by the defendant's four-count counterclaim which has reference to an agreement reached by the parties in December 1988. Pursuant to their contract, Hollander agreed to purchase from Gaynor at an agreed price a large quantity of switches which were to be supplied during 1989 in accordance with a delivery schedule requested by Hollander. It is Hollander's claim that, as a result of the faulty product supplied, he incurred substantial expense in unpackaging, re-packaging, and shipping the 29,000 switches recalled by the plaintiff. Furthermore, he alleges losses of good will and market share as a result of some of the defective switches which reached Hollander's customers, as well as other related expenditures.
Key to a resolution of issues raised by the counterclaim are the validity and effect of terms and conditions contained on the plaintiff's invoice form which was implemented and used commencing in early March 1988. The revised invoice was employed exclusively during the balance of 1988, including the period prior to and during the formation in December of the 1989 contract, and during the period of the parties' business dealings in 1989. For a period of some sixteen months before the dispute between the parties accrued the invoice terms and conditions limited the manufacturer's warranties and excluded the purchaser's right of recovery, except as to the cost of correcting defects in the product. Excluded from liability of the manufacturer were consequential damages of the purchaser, such as those claimed and described in paragraph 14 of the counterclaim, the crux of the defendant's damages claim.
It is the defendant's position that the disclaimer and limitation language never became a part of the contract. The court rejects the argument. Authority for inclusion of such terms may be found in Section 42a-2-207 of the General Statutes. ". . . [S]uch terms become part of the contract unless: (a) The offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (e) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." Id. 207(2).
The language had been in use for over nine months prior to formation in December 1988 of the 1989 contract. Its application to that contract merely continued, therefore, what was already in effect and materially altered nothing. Clearly, no voice in opposition was raised by the defendant until some seven months later when, in July 1989, a problem developed. "[Such] course of performance accepted or acquiesced in without objection is relevant to a determination of the meaning of a contract of sale." CT Page 10187 County Fire Door Corporation v. C.F. Wooding Co., 202 Conn. 277,287 (1987).
The notification statement on the face of each invoice is clearly visible. It represents a concise admonition to the purchaser that the goods therein described "are subject to the terms and conditions on the face and reverse side of [the] invoice." While the printing on the reverse side which sets forth the disputed terms and conditions is not easy to read, it is sufficiently legible to permit a reading by anyone, such as Mr. Hollander, who might be affected. The statement unmistakably calls the reader's attention to the limitation terms and conditions and their applicability to the transaction. In so doing, it negates the defendant's assertions that the reverse side printing was buried or "inconspicuous to the point of invisibility."
That Mr. Hollander could have been unaware of the printed terms and conditions until July 1989 when a problem arose strains the imagination, If so, it represents a glaring example of an absence of due diligence on the defendant's part. Section 42a-1-207 (27), Conn. Gen. Stat. Such diligence should be determined upon a consideration of all circumstances of the case. Reilly v. State, 32 Conn. Sup. 349, 355 (1976). "Courts have rarely found limitations of consequential damages in commercial transactions to be unconscionable;" Damin Aviation Corp. v. Sikorsky Aircraft, 705 F. Sup. 170, 177 (S.D. N.Y. 1989); and circumstances of the instant case militate strongly against a contrary finding.
The defendant's argument that the limitation of warranties and exclusion of consequential damages is unconscionable within the purview of the applicable law (Sec. 42a-2-302, Conn. Gen. Stat.) is also unpersuasive. Such limitation is specifically authorized by statute in the case of commercial loss; Sec.42a-2-719 (3), Conn. Gen. Stat.; 57 CBJ 457; and courts, in upholding such provisions, have recognized the current trend to be that of facilitating parties' freedom to allocate unknown or undeterminable risks. McKernan v. United Technologies Corp,717 F. Sup. 60, 70 (D.C. Conn. 1989).
Whether, nonetheless, an aura of procedural unconscionability attaches is "a matter of law to be decided by the court based on all the facts and circumstances of the case." Texaco, Inc. v. Golart, 206 Conn. 454, 461 (1988). In this connection, the record reflects that the disputed invoice, as hereinbefore mentioned, had been used in the case of the defendant's purchase orders without objection for about sixteen months. During the period Mr. Hollander, who was not an inexperienced businessman, received from Gaynor forty-one of the disputed invoices, each consisting of an CT Page 10188 original and duplicate. Admittedly, and as sole proprietor of his company, Hollander examined each invoice, endorsing the duplicate which was returned to Gaynor with payment. The court rejects the defendant's claim.
In the fourth count of his counterclaim, the defendant alleges that the actions of the plaintiff were unfair and deceptive and in violation of the Connecticut Unfair Trade Practices Act (CUTPA), Section 42-110b et seq. It is alleged that Gaynor failed to notify the defendant of its (Gaynor's) intentions to incorporate a design change in its switches; failed to afford the defendant an opportunity to test the switches before they were incorporated in the product; and, after such incorporation, concealed the fact that the design change was made.
In order to sustain a claim under CUTPA that a practice is unfair, three factors must be considered: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Web Press Services Corporation v. New London Motors, Inc., 205 Conn. 479, 482 (1987), quoting from FTC v. Sperry Hutchinson Co., 405 U.S. 233, 244-45 n. 5 (1972).
The evidence satisfies the court that it was not uncommon for Gaynor to make design changes in its products. Such changes were made to improve quality, for cost-effectiveness, and to keep modern within the industry. It was not the custom of the plaintiff to notify each customer of each and every design change, and there is no probative evidence that such was a custom, let alone a requirement, in the trade or that there was any intent to conceal from or deceive the defendant.
As hereinbefore mentioned, the specific cause of the defect remains unclear. What is clear, however, is that Gaynor recalled, and repaired or replaced 29,000 of the defective switches, and no claim is made that the company supplied any defective switches after July 1989.
The defendant's allegation (para. 15(d)) that the plaintiff was guilty of an unfair trade practice in attempting to enforce waivers of warranty of which the defendant was never made aware and which were unenforceable has been sufficiently addressed in this memorandum, and the court's findings with reference thereto need not be repeated. CT Page 10189
While recognizing the flexibility applicable to the standard of liability in a CUTPA claim; Sportsmen's Boating Corporation v. Hensley, 192 Conn. 747, 756-57 (1984); the court is not persuaded that the defendant has demonstrated conduct on the part of the plaintiff that reached the level of unfairness or could be described as immoral, unethical, oppressive, or unscrupulous; nor, moreover, has there been a showing of the degree of injury that is required.
For all of the reasons hereinbefore set forth, judgment may enter in favor of the plaintiff on the defendant's counterclaim.
GAFFNEY, J.